UNITED STATES of America,
Plaintiff-Appellee,

v.

Alain Asland PEREZ, Jerome Latchinian, Robert Kurtz, Edward J. Hernandez, Juan Jesus Roca, Defendants-Appellants.

No. 86–5459.

United States Court of Appeals,
Eleventh Circuit.

Aug. 24, 1987.

Donald I. Bierman, Bierman, Sonnett, Shohat & Sale, P.A., Robert M. Duboff, Benedict P. Kuehne, Miami, Fla., for Latchinian.

Jose M. Quinon, Coral Gables, Fla., Harry Solomon, Miami, Fla., for Hernandez.

Margaret S. Brodsky, Miami, Fla., for Alain A. Perez.

Laurel White Marc-Charles, Miami, Fla., for Kurtz.

Simon T. Steckel, Coral Gables, Fla., for Roca.

Leon B. Kellner, U.S. Atty., Michael E. Runowicz, Andrea M. Simonton, Linda C. Hertz, Asst. U.S. Attys., Miami, Fla. for U.S.

Before KRAVITCH and EDMONDSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

In this case the appellants challenge their convictions for various drug-related offenses arising from an importation of cocaine for the purpose of financing the assassination of the president of Honduras. As we find the evidence sufficient to support the convictions of each defendant, the convictions are affirmed.

## I. FACTS

The primary grounds of appeal concern the sufficiency of the evidence first in terms of the threshold requirement necessary to substantiate the use of co-conspirator statements under *United States v. James*, 590 F.2d 575 (5th Cir.) (en banc),

*cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979),[1] and second in terms of generally supporting the convictions. As the sufficiency of the evidence is challenged, a rather detailed recitation of the facts is required.

First, for clarity, it is noteworthy that the two principal actors behind the drug importation scheme were not defendants in this case. They are Gerard Latchinian, part owner of G & J Export Company, a Miami-based arms and munitions export business, and Faiz Sikaffy. The defendants in this case are Gerard Latchinian's brother, Jerome Latchinian, Alain Perez, a G & J employee, Robert Kurtz, Edward Hernandez, and Juan Roca.

This case began when Charles Odorizzi, a former U.S. Army officer, was approached to assist in a plot to overthrow the Honduran government. Odorizzi informed the FBI and was joined by undercover agent Salvadore Escobedo in order to investigate the situation. In meetings with Gerard Latchinian and Faiz Sikaffy the undercover operatives agreed to kill the Honduran president in exchange for a combination of cash and drugs. It is the importation of drugs for this intended purpose that forms the basis of the convictions in this case. Three hundred kilos of cocaine were actually smuggled into the country. Aside from that, the majority of physical evidence in this case consisted of recordings of telephone conversations and business meetings.

As the parties' meetings began to focus on drug importation, the actors' discussions shifted to the logistical ends of that enterprise. The parties discussed pilots, landing strips, refueling, unloading, deodorizing a plane, and an undetected flight into the United States. What appears to have been an aborted importation attempt occurred on October 20 or 21, 1984. While Odorizzi's and Escobedo's help was not solicited for this effort, knowledge of this attempt comes from wiretaps on Latchinian's and Sakiffy's residence and Latchinian's place of business.

Appellant Kurtz enters the scene in regard to this smuggling attempt through various conversations with Sikaffy. While language in Kurtz's conversations was euphemistic, his speech indicates his intimate involvement in obtaining a pilot for the venture. This particular venture was aborted, however, so help from the undercover operatives was elicited for the next attempt.

On October 22, 1984, Sikaffy and Gerard Latchinian met with Odorizzi and told him they wanted to bring in a load of cocaine on the following Saturday. Sikaffy asked Odorizzi to obtain a pilot, referred to as a "doctor," so he could test fly the plane in preparation for the flight. The next day, appellant Jerome Latchinian called Sikaffy and confirmed a meeting with Gerard Latchinian on Saturday. In the course of this conversation, Sikaffy asked appellant Latchinian to make a previously discussed proposal to Jerome's friend. The following day, October 24, 1984, appellant Kurtz called Sikaffy and told him that Jose Cymerman was going to pilot the plane. At a meeting with the undercover operatives that evening, plans were made for the flight. Sikaffy stated that appellant Kurtz would transport the cocaine once it arrived in the United States. Sikaffy further indicated that Kurtz had flown in the aircraft that morning and that it was prepared for the flight. Sikaffy also discussed the details of the money to be made, including his plan to give 10 kilos to an individual who had advanced them $100,000 for the plane. Kurtz would transport the remainder of the drugs to the Colombian owners in exchange for the money due them for importing the cocaine. Later that night, Gerard Latchinian received a call that problems had arisen in Colombia and the flight had to be cancelled until further notice.

Three meetings took place at Gerard Latchinian's residence on October 26, 1984.

1. In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), this Court adopted as precedent all of the decisions of the former Fifth Circuit decided prior to October 1, 1981.

The first occurred in the morning at approximately 10:00 a.m. The undercover operatives met with Sikaffy and Gerard Latchinian concerning the problems in Colombia that caused the cancellation. During the meeting, Sikaffy asked appellant Latchinian if he had contacted the individual with the $100,000. Appellant Latchinian responded negatively.

The second meeting that day occurred in the early afternoon. At that time, the undercover operatives were introduced to Jose Cymerman, who was to pilot the plane from Colombia, and to appellant Kurtz. Sikaffy proposed flying in marijuana; however, the undercover operatives and the pilot preferred to import cocaine.

The third and final meeting of the day took place at approximately 6:00 p.m. Present were the undercover operatives, Sikaffy, and appellants Perez, Kurtz, and Jerome Latchinian. All six men sat around a coffee table in the livingroom throughout the course of the meeting. Sikaffy mentioned that the reason the earlier flight had been cancelled was his suspicion that the Colombian authorities were aware of the scheme. Speculation ensued that the pilot appellant Kurtz had located might be an informant. Appellants Latchinian and Kurtz acknowledged meeting the pilot in Orlando. Appellant Latchinian described how he had discussed matters with the pilot while driving with him. Appellants Kurtz and Latchinian discussed the possibility that the pilot was an informant. The group concluded that the venture could continue as long as a new pilot, Jose Cymerman, was used.

Subsequent meetings were held the following day and on Sunday, October 28. These meetings involved further discussions concerning the importation scheme. Discussed were the two kilograms going to Kurtz for his distribution efforts, the money that appellant Latchinian would receive in advance, and the pilot's arrival in Colombia.

On the morning of October 28, Sikaffy, Kurtz, Gerard Latchinian and Jerome Lat-

chinian met at Sikaffy's home and made a series of calls. In the space of 45 minutes, from 10:30 a.m. to 11:17 a.m., appellant Latchinian called the residence of appellant Hernandez three times. Each time he spoke to appellant Roca who answered the phone and took messages. In the course of the third call, appellant Latchinian asked Roca to give Hernandez a message that "the chicks are here" and that Jerome wanted to know if "we're serious or not." Shortly thereafter, Hernandez called Sikaffy's residence and after speaking with Gerard Latchinian who advised him that "the girls are here," Hernandez acknowledged receiving appellant Latchinian's message. Sikaffy called Odorizzi by phone to advise him that the plane had arrived in Colombia at 10:30 and that it was being loaded with "a lot of meat." Hernandez called Sikaffy's residence again and asked appellant Latchinian to come over to his house.

At approximately 7:00 p.m., Kurtz, who was staying at Sikaffy's residence, received a telephone call from Gerard Latchinian advising him that he and Sikaffy had arrived at Vero Beach and registered at a hotel under a false name. Gerard Latchinian gave Kurtz a phone number for his brother Jerome to call if he should be in touch with Kurtz.

On October 28, 1984, an aircraft piloted by an FBI agent met with an aircraft over a rendevouz point in the Bahamas and led that plane into the United States. At approximately 6:00 p.m., the escorted plane, flown by Jose Cymerman, landed at a strip controlled by undercover FBI agents, and duffel bags containing 300 kilograms of cocaine were unloaded.

After being advised that the plane had landed safely, Kurtz, still at Sikaffy's residence, called his wife and excitedly advised her that 300 "babies" had come in and that he would be coming home with a couple of them. Kurtz then made a second call to another woman to advise her that he had "300 white leghorns" "all full sized chicks" that had all "hatched." Subsequently, Kurtz was advised by Gerard Latchinian

that there would be no movement of the "flowers" that night.

Once the drugs had arrived in this country, the undercover operatives met with Gerard Latchinian and Sikaffy in order to settle the mechanics of the delivery of the cocaine and the exchange of the money.

On November 1, 1984, at approximately 2:00 p.m., agent Escobedo went to Gerard Latchinian's office, at G & J Exports, and was admitted into the locked suite by appellant Perez. Perez was the only employee present. Just prior to this meeting, Sikaffy had a telephone conversation with appellant Latchinian at his brother's house. Essentially, appellant Latchinian informed Sikaffy that his man would take 20 kilograms of cocaine and that within two hours he would give Sikaffy half a million dollars in cash. Later, while Gerard Latchinian was meeting with Escobedo, he received a phone call from Sikaffy advising him that $100,000 was on its way. Gerard Latchinian told his brother, who was with Sikaffy, that 20 kilograms were being sent to him and that it would be better if the exchange of money could be effectuated more hastily. Further discussions ensued between Escobedo and Gerard Latchinian.

Agent Escobedo left the office and spoke with FBI agent St. Pierre who was waiting in the hall. Escobedo brought Pierre back to the office and after being admitted by appellant Perez, introduced St. Pierre as one of his men. After further discussions, appellant Perez left the room upon hearing a knock at the door and went towards the front of the office and engaged in some conversation. Perez returned to the room carrying two plastic shopping bags full of money. Appellant Roca, who had delivered the money, apologized for being late and stated that all of it was there give or take a few dollars. A total of $99,975 was in the bags. Perez, Roca, Jose Cymerman, and Gerard Latchinian were arrested at that time.

After his arrest and upon being advised of his rights, Perez acknowledged being present at the October 26, 1984 meeting where discussion concerning the cocaine took place. Perez also admitted that he was present at the November 1, 1984 meeting wherein an individual was to deliver $100,000 as part payment for the cocaine.

Appellant Jerome Latchinian and Faiz Sikaffy were arrested at Gerard Latchinian's residence also on November 1. Also present at the house was appellant Hernandez who was not arrested at that time.

## II. OPINION

The appellants were charged with various narcotic offenses. Included were charges for conspiracy to import cocaine in violation of 21 U.S.C. § 963, importation of cocaine in violation of 21 U.S.C. §§ 952(a) and 960(a)(1), conspiracy to possess cocaine intent to distribute in violation of 21 U.S.C. § 846, and attempted possession of cocaine with intent to distribute in violation of 21 U.S.C. § 846. Certain appellants were also charged with use of a telephone to facilitate these offenses. 21 U.S.C. § 843(b). After a jury trial on the issues, appellants Kurtz, Latchinian, Roca and Hernandez were convicted of all counts charged against them while appellant Perez was convicted on only two of the four counts he was charged with. Sentences ranged from seven to 18 years and included certain fines.

Various theories were postulated by members of the defense. Several played off the amorphous terminology and code words used by the parties in order to disguise their discussions about what the jury found to be involvement in a drug importation scheme.

Appellant Kurtz, who during the course of this matter was recorded as making references to "chicks," "300 white leghorns," and "300 babies," defended on the grounds that he intended to start a chicken farm. His wife testified that her husband had always talked about raising chickens, but that he had never in their 28 years of marriage purchased any. Kurtz also put a longtime friend on the stand, Odell Beard,

who testified that when Kurtz called her about the 300 babies she thought he was talking about raising fighting chickens. Beard, however, did concede that she seldom believed Kurtz except when he told her he loved her.

Hernandez, who was recorded referring to "chicks" and "girls" and his concern of whether or not the "girls had been separated", defended on a somewhat different ground. Hernandez argued that he was recorded referring to the women who are involved in the wild sex parties that take place at Gerard Latchinian's home. "Chicks" and "girls" were allegedly references to the female participants in these parties. Further, through medical testimony, Hernandez showed that appellant Jerome Latchinian is afflicted with the disease herpes which is an incurable and contagious venereal disease. Since both Latchinian and Hernandez participated in the sex parties, and since it would be imprudent for Hernandez to have sex with women who might have been infected by appellant Latchinian, Hernandez's contends that his concern of whether or not the "girls had been separated" referred to the separation of the female participants for the party. Accordingly, Hernandez argued that he was not referring to the separation of the kilos of cocaine.

The other appellants' defense theories concerned either the insufficiency of the government's proof or their lack of knowledge or involvement with the various crimes charged.

As stated, the jury found against the appellants. The pilot, Jose Cymerman, pled guilty prior to trial. The principal grounds for appeal in this case concern the sufficiency of the evidence. First, the appellants argue that there was insufficient evidence on which to base their convictions. Second, if sufficient overall evidence existed upon which to base the convictions, the parties argue that much of the evidence leading towards that end was improperly admitted. They contend that since the law requires that sufficient independent evidence of involvement in a conspiracy is necessary prior to the introduction of the statements of co-conspirators, insufficient independent evidence of involvement in the conspiracy was produced at trial and the government's failure to meet the legal threshold with such independent evidence precluded the introduction of co-conspirator statements. This argument is based on *United States v. James*, 590 F.2d 575 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979).

■ In *James*, the court outlined the requisite standard for the admissibility of co-conspirator statements pursuant to Federal Rule of Evidence 801(d)(2)(E). The court stated that:

> [O]n appropriate motion at the conclusion of all the evidence the court must determine as a factual matter whether the prosecution has shown by a preponderance of the evidence independent of the statement itself (1) that a conspiracy existed, (2) that the co-conspirator and the defendant against whom the co-conspirator's statement is offered are members of the conspiracy, and (3) that the statement was made during the course of and in furtherance of the conspiracy.

590 F.2d at 582. Accordingly, the prosecution must show by a preponderance of the evidence that the individual defendant is a participant in the conspiracy independent of the co-conspirator statements. This evaluation is made upon consideration of all non co-conspirator evidence offered by the prosecution. Independent evidence, of course, includes the defendant's own statements. *United States v. Carter*, 760 F.2d 1568, 1580–81 (11th Cir.1985).

In reviewing an allegation of error in the admission of co-conspirator statements, our role is to determine whether the district court was clearly erroneous in finding that a preponderance of the independent evidence established the existence of a conspiracy, that the declarant and the appellants were members of the conspiracy, and that the statements were made in the course of and in furtherance of the conspiracy. *United States v. Alvarez*, 755 F.2d

830, 855 n. 29 (11th Cir.1985). Upon reviewing the record, we conclude that the trial court correctly admitted the co-conspirator statements under *James.*

■ In regard to appellant Kurtz, independent evidence shows that Kurtz and Cymerman tested the aircraft that was ultimately used to import the load of cocaine. In intercepted phone conversations made after he received a coded message that the 300 kilos had arrived, Kurtz advised his associates that he would be arriving with a couple of them. The discredited testimony that he was going to raise chickens is unavailing. The independent evidence of conspiracy readily met the *James* standard.

■ Also, ample independent evidence indicated that appellant Latchinian was a member of the conspiracy. Jerome Latchinian discussed his conversations with the pilot that the group had tried to hire on a previous occasion. After the actual drugs arrived in the United States, appellant Latchinian made several incriminating telephone calls to appellant Hernandez's home.

Appellant Latchinian was arrested at the place where the drugs were to have been delivered. Appellant's own recorded statements served as direct evidence to independently establish his membership in the conspiracy.

■ The same Juan Roca who took the messages from appellant Latchinian arrived at Gerard Latchinian's business carrying plastic shopping bags containing almost $100,000 in cash in small bills. At the time he delivered the money he apologized for being late and indicated his knowledge of the contents of the bag by saying that the money was virtually all there. Gerard Latchinian, in Roca's presence, indicated that Roca was one of Latchinian's men, a statement with which Roca concurred. Roca's actions, as well as his words, established independently his membership in the conspiracy.

■ With regards to appellant Hernandez, there was also independent evidence of his involvement in the conspiracy. Hernandez had telephone conversations with Gerard Latchinian and appellant Latchinian in which he expressed his concern of whether or not the girls had been separated. The

disbelieved testimony concerning social diseases is unavailing. Furthermore, he was present at the time and place where the cocaine was to be delivered.

■ Perez, Gerard Latchinian's employee, was also shown to be involved in the conspiracy through independent evidence. He attended the October 26 meeting which addressed the drug importation scheme, he handled the money when it was delivered, and he was recorded making incriminating statements.

We find that the district court correctly found that the *James* standard was met so as to allow the introduction of co-conspirator statements. Furthermore, viewing the sufficiency of the properly admitted evidence at trial, and considered in the light most favorable to the government, we also conclude that the evidence as a whole established the appellants' guilt beyond a reasonable doubt. As such, we find the evidence sufficient with regard to both challenges made by the appellants.

In terms of the appellants' other grounds for appeal, which include an alleged *Brady* violation, certain jury misconduct, and the improper use of an informant, we find these contentions to be without merit. Accordingly, the convictions of all appellants are AFFIRMED.