**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Felipe VEGA, Defendant–Appellant.**

**No. 87–2766.**

United States Court of Appeals, Seventh Circuit.

Argued April 12, 1988.

Decided Oct. 17, 1988.

Thomas A. Gibbons, Mitchell D. Kreiter & Associates, Chicago, Ill., for defendant-appellant.

Michael A. Thill, Asst. U.S. Atty., James G. Richmond, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before POSNER, COFFEY and FLAUM, Circuit Judges.

COFFEY, Circuit Judge.

Felipe Vega appeals his convictions and sentences on charges of conspiracy to possess with intent to distribute and to distribute cocaine in violation of 21 U.S.C. §§ 846, 841(a)(1) and of utilization of a communications facility in committing such an offense in violation of 21 U.S.C. § 843(b). We affirm.

## I. FACTUAL BACKGROUND

Felipe Vega was originally charged in a 61–count indictment charging 32 defendants with various drug conspiracy violations. This was the same indictment involved in our decision in *United States v. Zambrana*, 841 F.2d 1320 (7th Cir.1988). As we detail, *infra*, Vega's case was severed, on his own motion, from those of the other defendants named in the Zambrana indictment.

Vega's indictment stemmed from a United States Drug Enforcement Agency (DEA) investigation, coordinated with local law enforcement agencies, of drug trafficking carried on by the Zambrana family and others in the northwest Indiana area. As part of the investigation a court-authorized wiretap was placed on the telephone at the residence of Jesus Zambrana in Gary, Indiana, from March to July, 1985. On the basis of the wiretap it was learned that the Zambranas were carrying on a sophisticated drug trafficking operation and were to receive a cocaine shipment in Gary, Indiana, on April 25, 1985. This shipment originated with an Antonio Dominguez in Miami, Florida. The cocaine was to be transported to the Zambranas by automobile.

On the evening of April 25, 1985, the DEA established surveillance at various points on highway routes leading into Gary, Indiana. The purpose of this surveillance was to intercept a vehicle transporting suspected drugs from Florida to Gary, Indiana. As an aid to the surveillance procedure, DEA Agents Michael Ehrsam and Elaine Harris prepared a list containing names of possible drivers of the vehicles as well as descriptions of the cars.

As part of this surveillance operation, DEA Agent Ehrsam and four Lake County, Indiana, Sheriff's Officers stationed themselves on the northbound lanes of Interstate 65 at the intersection of State Route 231 in the Crown Point, Indiana, area. This location was roughly 15 miles from the Zambrana house. While on surveillance, Agent Ehrsam and Lake County, Indiana, Sheriff's Department Patrolman Timothy Downs observed a rose-colored 1984 Oldsmobile driving in an erratic manner. Ehrsam and Downs followed the vehicle for three or four miles and then directed the driver to pull over. Officer Downs requested the driver's license and registration of the vehicle's operator. The driver's name was Ernest Lonzo, an individual whose name appeared on the DEA's list of possible drug transfer drivers. Officer Downs then ran a check on Ernest Lonzo's driver's license as well as the involved vehicle's registration. Downs discovered that Lonzo was operating a vehicle with a suspended driver's license. Lonzo was arrested and transported to the Lake County Sheriff's Department, together with his passenger, Charles Cole.

Lonzo's automobile was impounded at the Lake County Sheriff's Garage in Crown Point, Indiana, and was thereafter searched pursuant to a search warrant issued on April 25, 1985. Found in the automobile were two brown plastic garbage bags and two packages bound with grey furnace tape. The two garbage bags each contained two packages bound with grey furnace tape. All six of the packages bound with grey furnace tape contained a white powdery substance. The packages were sent to the DEA lab where they were tested and found to contain 5,847.01 grams of 92 per cent pure cocaine.[1]

---

**1.** Other evidence concerning general aspects of the Zambrana drug conspiracy was introduced. First, Antonio Dominguez, originator of the April 1985 shipment to the Zambranas, spoke with Jesus Zambrana on June 23, 1985. Dominguez asked whether his "uncle" had left and

As in many drug conspiracy cases, the evidence linking Felipe Vega with the claimed Zambrana drug conspiracy was circumstantial. The evidence included recordings of telephone calls Vega and his wife made to Jesus Zambrana's residence between March 21, 1985 and April 30, 1985, and between June 14, 1985 and July 2, 1985. Also significant were inferences drawn from the correlation between the dates and timing of these telephone calls and suspected drug deliveries to the Zambrana residence.

The identification of the participants in the recorded telephone conversations was questioned at trial. In the eight tapes involving Felipe Vega, his voice was identified by St. John, Indiana, Police Detective Bernard J. Johnsen, who testified on both direct and cross-examination that it was his opinion that Vega's voice was recorded on eight tapes out of the nine tapes submitted to him for identification.[2] As indicated previously, pursuant to this procedure Detective Johnsen identified Vega's voice on eight of the tapes given him, but stated that Vega's voice was not on the other tape presented for identification. On cross-examination Officer Johnsen identified Vega in the following fashion:

"MR. BEMIS (Vega's Attorney): Q: When you listened to that tape and drew your opinion as to—that it was Mr. Vega talking on the tape, could you—could you say for certainty that that could be nobody else in the world other than Mr. Vega?

JOHNSEN: A: My opinion is that that was Mr. Vega.

Q: And it is your opinion that was nobody else?

A: No. I'm sure the voice I heard was Felipe Vega."

Officer Johnsen's identification of Vega's voice on the tapes was based upon a comparison of Vega's recorded voice with Johnsen's recollection of Vega's voice during a two-hour conversation he had with Vega approximately two years prior to trial. Johnsen's conversation with Vega at that time had been in English, although he had also had an opportunity to listen to Vega speaking in Spanish with another agent during the same two-hour conversation. Vega attempted to challenge Johnsen's lay identification of Vega's voice on the basis of Officer Johnsen's inability to speak Spanish and the fact that Johnsen had not previously spoken with Vega on the telephone. It is interesting to note that the cross-examination of Johnsen did not focus on his observation of the specific aspects of Vega's voice.[3]

Most of the telephone calls between Felipe Vega and the drug headquarters at the Zambrana residence were in Spanish. Much of the conversation was of an informal nature, with the parties advisedly not using words referring to drugs. The government, however, focuses on certain code words which it contends are known and accepted in the drug world.

Tom Lovely, an active and convicted member of the same Zambrana drug conspiracy, testified that Jay Zambrana instructed Lovely to use "code words" when speaking about drugs on the telephone.

---

asked that Jesus have this person call Dominguez. The government alleges that this exchange refers to the details of a drug shipment, and that it coincides roughly with the June 1985 conversations between Vega and Zambrana discussed *infra*. Second, many of Vega's original co-defendants in the Zambrana case made calls to the Zambrana household between April 30, 1985, and June 14, 1985, to obtain cocaine and/or marijuana. Finally, Thomas Lovely testified that he had bought cocaine several times from the Zambranas between February and July 1985 and that he had resold some of this cocaine.

**2.** At the time of trial, Johnsen had been a St. John, Indiana police officer for thirteen years

and had served as head of that police department's detective bureau for eight years.

**3.** Direct identification testimony was also provided concerning other speakers in taped conversations. Tom Lovely, a convicted active member of the conspiracy who had known all the Zambranas for roughly nine years, identified the other speaker as either Jay, John or Jesus Zambrana in five of the eight tapes identified as involving Vega. Lovely and DEA Special Agent Barry Carew respectively identified Jesus Zambrana and Antonio Dominguez in the conversation between these two individuals. Lovely also identified Jesus Zambrana in a conversation with a woman who identified herself as Vega's wife.

Lovely said he used whatever word came to mind, such as *"stuff"* or *"shit."* Although Lovely gave *"chicken"* as an example of a possible code word, he stated that he himself had never used that particular word for drugs.

In his conversations with the Zambranas, Vega frequently used words such as *"chickens," "roosters,"* or *"it,"* which the government contends represented code words commonly used in the drug world. It should be noted that while Tom Lovely, when questioned, did testify that the Zambranas had chickens on their farm, the record is devoid of evidence either that the Zambranas or Vega bartered, traded or dealt in chicken sales at any time.

The use of "code words" like "chicken" in Vega's conversation with the Zambranas can be noted in the August 11, 1985 conversation between Felipe Vega and Jay Zambrana, which is the basis of a use of a communications facility charge against Vega:

"FELIPE: Listen. For ... For the four *chickens,* how much are you going to charge me for each *chicken*?

JAY: Well, the same as always. You know what it is.

FELIPE: Oh, four seven and something.

JAY: Yeah.

FELIPE: Okay. Then get one *chicken* for me.

JAY: When?

FELIPE: Tomorrow.

JAY: Okay. One?

FELIPE: Yes.

JAY: One or two or three?

FELIPE: No, one *chicken* for ... for, you know, to....

JAY: Okay, that's fine. That's fine.

FELIPE: It's for another person (unintelligible) that *chicken,* man.

JAY: Fine. (Beep) Okay."

This conversation followed a March 21 conversation between Vega and another person at the Zambrana residence. In this conversation Felipe Vega asked if Jesus Zambrana could get him four *"chickens."* This conversation also followed a March 29 taped conversation in which Vega spoke at length with someone at the Zambrana residence concerning exchanges of a *"chicken"* and *"roosters."* Subsequently, on April 30, 1985, Felipe Vega had another conversation with a person at the Zambrana residence. In this conversation Vega stated that *"it"* was good. Later Vega and this person spoke about "the price" Jesus Zambrana was asking. Each of these conversations took place in close and near proximity to the time of the law enforcement officers' April 25 interception of the Zambranas' drug delivery.

The next conversation between Vega and the Zambrana household occurred on June 14, 1985, when Vega spoke with Jesus Zambrana. Zambrana said that they were *"still waiting."* In light of the drug shipment the government contends was en route to Zambrana, referred to in the June 23, 1985, conversation between known drug conspirators Antonio Dominguez and Jesus Zambrana, the jury could very logically have inferred that Zambrana and Vega were "still waiting" with bated breath for the expected drug shipment. After speaking about work-related matters, Vega and Zambrana ended their conversation by agreeing that Vega would call the next day. On June 18, 1985, Jesus Zambrana told Vega that they were *"still waiting for (unintelligible) of the passage"* and that he would *"let [Vega] know when."* Later on in that conversation the following exchange took place:

"FELIPE: Today, more or less. *Will it arrive*?

JESUS: Well, I can't tell you for sure, because I would be lying, you know, *it's better to be sure one way or the other. If the people are going to get here today or tomorrow or when.*

FELIPE: Ah, ha, at what time?

JESUS: Yes, ok. I will let you know. *I will let you know as soon as I hear when they will get here."*

(Emphasis added). Felipe Vega called Jesus Zambrana again on June 21 and was told that they were *"waiting."* On June 28, 1985, Felipe Vega again called Jesus Zambrana inquiring when Zambrana was going to *"take care"* of him. Zambrana

replied that there was *"nothing yet,"* they were *"still waiting"* and that someone had told him *"two or three days."* Felipe Vega then spoke to Zambrana about a trip to Puerto Rico he was taking and the impending wedding of his daughter. This entire sequence of taped conversations clearly coincides with the expected drug shipment described in the June 23, 1985, taped conversation between Jesus Zambrana and Dominguez.

Finally, on July 2, 1985, a woman identifying herself as Felipe Vega's wife called Jesus Zambrana and during her conversation asked *"[n]othing yet?"* Zambrana answered that *"the associate is leaving in the evening."* The woman then mentioned that Felipe Vega was in Puerto Rico and asked whether Zambrana had *"anything."* A period of inquiry about each other's identity followed. When the woman made clear she was Felipe Vega's wife, Zambrana was evidently satisfied and stated she could *"come by."* However, he added that if she was going to come she should let Zambrana know so he could have *"everything ready."* Again, in light of the continued inquiry concerning arrival times in a conversation following earlier taped conversations of the same nature, this discussion appears consistent with the arrival of the awaited drug shipment to the Zambranas in this time frame. The woman said I need four *"with the wedding."* These words appear to be the type of "nonsensical language" which is employed as code language for illegal drugs. *See United States v. Ramirez,* 796 F.2d 212, 215 (7th Cir.1986) ("Witness at the trial explained that the nonsensical language employed by the conversants was a code for illegal drugs"). Zambrana indicated assent and asked if the woman was going to *"send the guy now."* She said she would send him to Zambrana's house later that night, to which Zambrana agreed.

## II. PROCEDURAL BACKGROUND

A grand jury handed down an indictment charging Felipe Vega with conspiracy to possess with intent to distribute and to distribute cocaine in violation of 21 U.S.C. §§ 846, 841(a)(1), possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 and of utilization of a communications facility in committing the conspiracy offense in violation of 21 U.S.C. § 843(b), as part of the 61–count indictment of 32 defendants in *U.S. v. Zambrana.* Vega entered his initial appearance on July 30, 1985. On August 27, 1985, Vega filed a motion for severance alleging prejudicial joinder. Vega's severance motion was one of many filed by codefendants following the indictment.

The case was assigned to then District Judge Michael Kanne. On October 7, 1985, Judge Kanne entered an order severing Jesus Zambrana's case from that of his codefendants and continuing trials in all the cases. Jesus Zambrana's trial was set for October 21, 1985, and the trial of the remaining defendants was set for November 4, 1985. The order also continued the involved trials to further the ends of justice pursuant to 18 U.S.C. § 3161(h)(8)(A). The order noted that a 61 count indictment charging all 32 defendants was presently filed in a single case, with a number of attorneys involved. The court further observed that this was "a case of extensive proportions presenting extremely complex problems in assuring a fair trial." The court determined that the most appropriate course for it to take would be to "acknowledg[e] the existence of a judicial emergency under 18 U.S.C. § 3161(h)(8)" and utilize severance procedures. Under this method the court would "initially proceed with one trial involving a single defendant and, in accordance with the declared judicial emergency, continue the trials of remaining defendants subject to severance where appropriate." The court further noted that

"[b]ecause of the unusual and complex nature of this case it is unreasonable to expect trial of all defendants to take place within the time limits established by 18 U.S.C. § 3161. Accordingly, the court finds the ends of justice will be served by the granting of continuances and severance in this cause. The granting of continuances clearly outweigh the interests of the public and the defendants in a speedy trial."

The court went on to observe that the complexity of the case, the jury's capacity to follow instructions and the jury's ability to apply evidence to the proper defendant all required severance rather than a single trial.

The court followed its continuance order with an October 11, 1985, order setting a trailing calendar of individual trials for most defendants and stating that joinder of defendants would be ordered where appropriate. Felipe Vega's trial was to be the 21st of the 23 scheduled trials.

On April 17, 1987, when Vega's trial was set for June 7, 1987, he moved to dismiss with prejudice under the Speedy Trial Act.

The court denied the motion on June 10, 1987. The court noted the actions it had taken in 1985 and also addressed Vega's contention that the judicial emergency declared in 1985 had ceased to exist. The court observed that Vega had made no showing that he had been prejudiced by the delay, a requirement for reversal of an exclusion of time under the Speedy Trial Act. The court further noted that a judicial emergency had been caused. This emergency had resulted because this case involved many non-English-speaking defendants, and the 32 defendant indictment had been assigned to a single judge. This case followed another multi-defendant drug case assigned to the same judge and was pending in addition to the court's normal civil and criminal calendar. Delays in some cases obviously were going to be necessary in order that the court might address and protect the rights of all parties.

On August 25, 1987, Vega moved to have the court reconsider its June 10, 1987, ruling denying dismissal on Speedy Trial Act grounds. The motion stated that many of the trials in the Zambrana cases had taken less than a week and cited several specific civil cases tried during the period following the original indictment.

Upon Judge Kanne's elevation to the appellate court, the case was transferred to Judge Sharp, who denied the motion in an order dated September 8, 1987. The court, in its ruling, observed that there had been no showing of prejudice as a result of the exclusion. Delay was also attributed to the attention required to be given other cases as well as the effect on the court calendar resulting from Judge Kanne's elevation to the appellate court.

The trial took place on September 9–11, 1987, and the jury convicted Vega on the two charges of conspiracy to possess with intent to distribute and to distribute cocaine in violation of 21 U.S.C. §§ 846, 841(a) and of utilization of a communications facility in committing such an offense in violation of 21 U.S.C. § 843(b) which were submitted for verdict.

Vega was sentenced on October 21, 1987. At that time the court noted the seriousness of Vega's crimes and made the following statements:

"[U]nless our society and its Congress decide to cut and run, the message that I read from the Congress of the United States—and I'll have a comment on that further in a minute—is that those who engage this [sic] these kinds of criminal conduct should be, and perhaps in many instances must be dealt with firmly, within our Constitution and its laws.

Beginning at the first of next month we will have in place a new system of sentencing. It does not apply to this case, but it is a subject of great interest in the Department of Justice, in the judiciary, in the press, and indeed in the public. It is a creature of the Congress.

I have taken the trouble to have the probation officer work out under the new sentencing guidelines, which admittedly do not—which are admittedly not mandatory here, what a sentence would be for this offense or these offenses under those new guidelines. And I shall make that a part of the record, because it does influence the sentence that I am going to impose.

And so that no one will doubt exactly the process that has been gone through, and granted it's an advisory one, I shall lay the entire thing in the record, along with the presentence report and the other papers.

And the guideline range for the offense in Count 1, given this defendant's charac-

teristics, the guideline range is from 78 to 97 months. I think when one considers that range, one has to believe that not only the Congress but the Commission that the Congress created to fix these guidelines, which became law after the 1st of November, it is a further manifestation of the fact that this is serious criminal conduct that must been [sic] dealt with in a serious manner.

\* \* \* \* \* \*

Influenced but not compelled by the analysis in the guidelines, and considering the evidence that I have heard in the trial of this case, I now sentence the defendant, Felipe Vega to a term of 78 months, which is the low guideline, or six and one half years on Count 1; and sentence him to a term of four years on Count 2 [sic] to be concurrent."

Vega challenges his conviction and sentence on five separate grounds: (1) that the court refused to dismiss his case pursuant to the Speedy Trial Act; (2) that the procedure for identification of Felipe Vega's voice was impermissibly suggestive, and the identification itself was unreliable; (3) that tape-recorded conversations were admitted in which speakers were not identified; (4) that the evidence was insufficient to prove Vega's involvement in the conspiracy; and (5) that the court's use of the federal sentencing guidelines prior to their effective date violated the constitutional protection against *ex post facto* laws.

### III. SPEEDY TRIAL ACT

The Speedy Trial Act generally requires that trials in criminal cases commence within 70 days of the filing date of the information or indictment, or from the date of initial appearance, whichever last occurs. 18 U.S.C. § 3161(c)(1). However, the Act provides that several periods of time may be excluded from this 70–day period. 18 U.S.C. § 3161(h). Among the permitted exclusions is delay "resulting from a continuance granted ... on the basis of ... find-

ings that the ends of justice served by [the continuance] outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(8)(A).

An "ends of justice" continuance must be granted before "the period sought to be excluded begins to run."[4] This requires the district judge to "consider the matter at the outset and determine whether the 'ends of justice' require that the trial be postponed." *United States v. Janik*, 723 F.2d 537, 545 (7th Cir.1983) (quoting *United States v. Brooks*, 697 F.2d 517, 522 (3d Cir.1982)). The findings required to support such a continuance may be made based upon a variety of permissible factors, 18 U.S.C. § 3161(h)(8)(B), but they may not be based upon "general congestion of the court's calendar." 18 U.S.C. § 3161(h)(8)(C).

■ In evaluating the propriety of this continuance we must determine whether it was based on the impermissible consideration of general docket congestion. The district court's findings supporting the continuance clearly set forth that the large number of defendants and the number of counts involved in the Zambrana case made it unlikely that the trials of all defendants could occur within the prescribed time limits. The court also observed that severance would likely be necessary in some cases and that such severance would more adequately serve the ends of justice, as well as result in some delay. The district judge obviously could have delayed a single multi-defendant trial based upon its complexity. *See* 18 U.S.C. § 3161(h)(8)(B); *United States v. Thomas*, 774 F.2d 807, 810 (7th Cir.1985) (Ends of justice continuance appropriate based on complexity of six-defendant case involving extensive documentary evidence). It necessarily follows that delays resulting from the severance essential to preserve individual rights in a specific, complex multiple-defendant proceeding, especially when requested by a defendant, are not to be considered "gener-

4. *United States v. Janik*, 723 F.2d 537, 545 (7th Cir.1983). The continuance in this case was granted on October 7, 1985, prior to the conclusion of the 70–day period following Vega's ini-

tial appearance. Thus, pursuant to 18 U.S.C. § 3161(h)(8), the continuance could validly exclude any period of time during which it was effective.

al" docket congestion. *Cf. United States v. Brainer,* 691 F.2d 691, 698 (4th Cir.1982) (language noting that general congestion arguably does not apply to resolution of "specific, temporary scheduling conflicts if the ends of justice so require"); *United States v. Nance,* 666 F.2d 353, 358 (9th Cir.1982) ("specific delay" resulting from unexpected extension of trial set to take advantage of unused court resources is not "general congestion"). To hold otherwise could result in a situation in which the requirements of the Speedy Trial Act could very well become an obstacle to defendants who seek to obtain the desired protections accompanying severance.

■ Since the court did not rely upon an impermissible factor in granting the continuance, we proceed to review its decision to allow a continuance under 18 U.S.C. § 3161(h)(8)(A). This court has noted that "the decision to grant a continuance under the Speedy Trial Act, and accompanying decision to exclude the delay under (h)(8)(A) is addressed to the discretion of the trial court. To obtain a reversal of the court's decision a defendant must show actual prejudice." *United States v. Tedesco,* 726 F.2d 1216, 1221 (7th Cir.1984) (citation omitted). *See also United States v. Scott,* 784 F.2d 787, 789 (7th Cir.1986) (per curiam) ("Absent legal error, exclusions of time cannot be reversed except when there is an abuse of discretion by the court and a showing of actual prejudice"). There is nothing in this record to substantiate a holding that the district court's grant of the continuance constituted an abuse of discretion.[5] The district court appropriately considered the ends of justice in determining that the complexity of a case involving a 61 count, 32 defendant indictment and the value of sev-

erance outweighed the interest in a speedy trial. Further, Vega made no showing of actual prejudice resulting from the delay. Accordingly, the district court appropriately granted the continuance in this matter.

■ Vega contends, also, that his case should be dismissed because the conditions the district court originally relied upon in granting its continuance had ceased to exist in the period following its entry. We disagree and hold that an argument of this nature does not and will not support the dismissal requested. As we noted *supra,* the question of the propriety of an ends of justice continuance is directed to the district court's exercise of discretion at the outset of a proceeding. *Janik,* 723 F.2d at 545. If conditions change following the granting of the continuance, they may justify an adjustment in the court's trial calendar involving an advancement or a rescheduling of the trial date, but they will not justify dismissal of a case in which a valid continuance or adjournment has been granted. In this respect this case appears analogous to *United States v. Carlone,* 666 F.2d 1112, 1115–16 (7th Cir.1981) in which we disapproved of a district court's retroactive revocation of a continuance based upon changes occurring after the continuance's entry. We stated:

"There is nothing in the Speedy Trial Act which says that a continuance valid when granted becomes invalid *ab initio* if the reasons for which the continuance was granted turn out not to be the actual causes of the delay that the continuance allows. Contingencies not foreseen when the continuance was asked for and granted may arise that prevent the government from using the continuance

5. In *United States v. Zambrana,* 841 F.2d 1320, 1328 (7th Cir.1988), we recently emphasized the importance of permitting a trial judge discretion under the Speedy Trial Act:

"[T]he interest of allowing trial judges to effectively monitor their overworked court calendars necessitates that latitude be afforded the district court.... In *Kagan v. Caterpillar Tractor Company,* 795 F.2d 601 (7th Cir.1986), we stated that:

'Trial judges have a responsibility to litigants to keep their court calendars as current as humanly possible. This is not an easy task

in view of the nearly impossible demands placed on trial judges in the overburdened federal system.... [A]s of June 30, 1985, the average number of cases pending on a district judge's calendar was 643. Thus, if a trial judge does not closely monitor his calendar and prevent needless delay, he would soon be buried beneath the pending case load.'
*Id.* at 608. 'It is critically important that a trial court be able to maintain control over its calendars'.... *Stevens v. Greyhound Lines Inc.,* 710 F.2d 1224, 1230 (7th Cir.1983)."
(Citation omitted).

for the purposes for which it was granted. If so, the court can refuse to grant further continuances; it can revoke or shorten the continuance; but it is not *required* to revoke the continuance with effect back to the trial date. We are unwilling to read so inflexible a mandate into the Act."

*Id.* at 1115 (emphasis in original). Just as the changes in *Carlone* did not require (or even permit) the district court to retroactively vacate the continuance and effectively dismiss the case,[6] any changes taking place after entry of the continuance in this case do not justify dismissal under the Speedy Trial Act.

## IV. VOICE IDENTIFICATION OF VEGA

Vega argues that the procedures utilized to identify his tape-recorded voice were impermissibly suggestive and that the identification was unreliable.

In *United States v. Zambrana*, 841 F.2d 1320, 1338, 1339 (7th Cir.1988), we laid out our general standard concerning the admissibility of tape recordings:

" 'Tape recordings are only admissible if the government can establish by clear and convincing evidence, that the recordings are "true, accurate, and authentic recording[s] of the conversation[s], at given time[s], between the parties involved." *United States v. Keck*, 773 F.2d 759, 766 (7th Cir.1985) (quoting *United States v. Faurote*, 749 F.2d 40, 43 (7th Cir.1984)).' " ... "As we stated in *United States v. Faurote*, '[t]he trial judge's ruling on the admissibility of the tape will not be overturned on appeal absent "extraordinary circumstances." ' 749 F.2d at 43. Moreover, because '[t]he trial judge [is] in the best position to weigh the credibility of the parties and the evidence presented,' *id.* at 44, 'the trial judge exercises broad discretion in determining whether [the government's] burden has been satisfied.' *Id.* at 43."

■ There is little question that Officer Johnsen's identification of Vega's voice meets the requirements of Federal Rule of Evidence 901(b)(5) which permits voice identification of tape recordings to be made "by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." As long as the basic requirement of familiarity with the voice is met, lay opinion testimony is an acceptable means for establishing a speaker's identity. *See United States v. Thomas*, 586 F.2d 123, 133 (9th Cir.1978) ("lay opinion on [voice identification] is permissible so long as the witness testifying has this requisite familiarity with the speaker"); Federal Rule of Evidence 901 advisory committee note to subdivision (b)—example (5) ("[A]ural voice identification is not a subject of expert testimony"). When this standard is considered in light of the broad discretion accorded trial court judges in making these admissibility determinations, there would certainly appear to be no bar to an identification which has been made based upon one previous two-hour contact with the speaker. Any questions concerning the length of Officer Johnsen's previous contact with Vega or the time between this contact and the identification, simply go to the weight the jury accords this evidence, not to its admissibility. *See United States ex rel. Kosik v. Napoli*, 814 F.2d 1151, 1156 n. 9 (7th Cir.1987) (Eyewitness identification case distinguishing the role of the judge and jury by differentiating between "the degree of reliability needed to admit identification evidence, on the one hand, or to credit it in case it is admitted, on the other").

■ In this case the question of the identification's alleged "suggestiveness" also does not create any significant difficulty. The government asserts that Vega waived his right to object to his identification on the basis of suggestiveness because he failed to raise that objection before the trial court. Although Vega objected to the admission of tape recordings on which his voice was alleged to appear on the basis of the "insufficiency" of his identification and questioned the identification procedures during Officer Johnsen's testimony, he

---

6. *See Carlone*, 666 F.2d at 1115–16.

failed to make an explicit objection to the admission of the tapes based upon "suggestiveness." Vega's broad objection lacks the specificity required to preserve the issue for appeal. In this respect, we noted in *United States v. Wynn*, 845 F.2d 1439, 1442 (7th Cir.1988):

"To preserve an issue for appellate review, a party must make a proper objection at trial that alerts the court and opposing party to the specific grounds for the objection. An objection is proper only if 'a timely objection or motion to strike appears of record, stating the *specific ground of objection, if the specific ground was not apparent from the context....*' Fed.R.Evid. 103(a)(1). Neither a general objection to the evidence nor a specific objection on other grounds will preserve the issue for review. 'The specific ground for reversal of an evidentiary ruling on appeal must also be the same as that raised at trial.' *United States v. Taylor*, 800 F.2d 1012, 1017 (10th Cir.1986), *cert. denied*, [— U.S. —] 108 S.Ct. 123 [98 L.Ed.2d 81] (1987)."

(Citations and footnote omitted) (emphasis added). Accordingly, the standard for review of any "suggestiveness" claim would be the "plain error" doctrine of Rule 52(b) of the Federal Rules of Criminal Procedure. *Id.*

■ The standard of review to be applied ultimately makes little difference in this case because, under any review standard, it is evident that the identification procedure used here was not "suggestive." In *Zambrana*, 841 F.2d at 1339, we reviewed the alleged "suggestiveness" question as part of our analysis of the district court's general resolution of the question of a tape's admissibility. In rejecting a claim of "suggestiveness," we observed:

"Because of Agent McDaniel's stated familiarity with Jesus Zambrana's voice characteristics, Agent McDaniel's identification of Jesus Zambrana is not susceptible to meaningful challenge even though he viewed a transcript listing the speaker's name in the margin before listening to the first of approximately 30 tapes. After a review of the record and

testimony in this case, we are convinced that where Agent McDaniel: (1) followed a non-suggestive neutral procedure for identifying the bulk of the tapes, and (2) demonstrated a true familiarity with the tone, quality, and inflections that distinguished Jesus Zambrana's voice based upon his recollection of past conversations with Zambrana, the mechanical problem on the first tape does not constitute reversible error.... In light of Agent McDaniel's testimony that he could recognize the characteristics of Jesus Zambrana's voice and his positive identification of that voice on each of approximately 30 tapes, we agree with the trial judge's assessment that Agent McDaniel's testimony established 'that the recordings are "true, accurate, and authentic recording[s] of the conversation[s], at given time[s], between the parties involved."' *Keck*, 773 F.2d at 766 (quoting *Faurote*, 749 F.2d at 43). Considering the entire record, we hold that in the fact situation presented, no 'extraordinary circumstances' exist to justify disturbing the trial judge's reception of the tapes in evidence."

This case clearly requires the same disposition of the "suggestiveness" question as we made in *Zambrana*. A request that a police officer ascertain if a particular individual's voice is on a certain tape or tapes, some of which apparently included his voice and another which did not, cannot create the "substantial likelihood of irreparable misidentification" we have required to be demonstrated as a prerequisite for finding other types of pretrial identification procedures "suggestive." *See generally United States v. L'Allier*, 838 F.2d 234, 239 (7th Cir.1988) (photographic identification case); *United States ex rel. Kosik v. Napoli*, 814 F.2d 1151, 1155 (7th Cir.1987) (eyewitness identification case). Moreover, because Officer Johnsen's identification and dismissal of identification of Vega's voice was certain, was made consistently throughout a series of nine tapes, and was made without any real or inferred "suggestion," Officer Johnsen's independent familiarity with Vega was not supplanted. *See*

*Brown v. Harris,* 666 F.2d 782, 785–86 (2nd Cir.1981) ("If the court is convinced that a witness's knowledge is so firm that he is not susceptible to suggestion, then his testimony can be received at trial"). Under these circumstances we hold that the trial judge did not abuse his discretion in determining that the government satisfied its burden of establishing that the recordings in fact were of Felipe Vega's voice.

We emphasize that our decision that the trial judge properly exercised his discretion in allowing the jury to consider Officer Johnsen's identification of Vega's voice and the tape recordings themselves is likewise based upon our position as a reviewing court. We have previously stated in an eyewitness identification case that as a reviewing court: "It is, of course, not our function in this setting to judge the ultimate accuracy of the identification; that decision [is] made by the jury in its role as finder of the facts. Our role is a much more limited one of determining if the identification was so unreliable that the defendant's due process right to fair judicial procedures should have precluded an identification at trial." *Napoli,* 814 F.2d at 1156 (footnote omitted). As the United States Supreme Court observed in rejecting a challenge to an allegedly suggestive photographic identification procedure:

"Surely, we cannot say that under all the circumstances of this case there is 'a very substantial likelihood of irreparable misidentification.' Short of that point, [evidence affecting the reliability of the identification] is for the jury to weigh. We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature."

*Manson v. Brathwaite,* 432 U.S. 98, 116, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140 (1977) (citation omitted). Questions of this nature go to the witness' credibility. As we recognized in *United States v. Ramirez,* 796 F.2d 212, 214 (7th Cir.1986): "An appellate court will not weigh the evidence or assess

the credibility of the witnesses." All we determine is that the trial judge did not abuse his discretion in determining that the recordings accurately portrayed conversations between the involved parties. The jury, then, ultimately determined the question of whether Vega's voice was actually on the tapes.

We wish to point out that Vega does not challenge the admission of any of the tapes on the basis that the quality of the tapes made it difficult to identify voices or that transcripts translating these tapes from Spanish to English were provided the jury. Upon review of the record, neither of these claims would support the exclusion of these tapes.

In *United States v. Wilson,* 578 F.2d 67, 69 (5th Cir.1978), the Fifth Circuit noted the standard to be applied in cases in which problems of tape unintelligibility exist:

"Tape recordings which are only partially unintelligible are admissible unless the unintelligible portions are so substantial as to render the recording as a whole untrustworthy. The initial decision whether to admit into evidence a recording containing inaudible or unintelligible portions is committed to the sound discretion of the trial court. Here, the district court listened to the tape and recognized that some of the conversation was not intelligible, but found that a sufficient portion was understandable and had enough probative value to warrant its admission. After carefully listening to the tape, we agree with the district court's decision to admit the tape. While some portions of the recording are inaudible and unintelligible, much of it can be heard clearly. Certainly, defendants have not shown an abuse of the district court's discretion."

(Citations omitted). Here also discretion was properly exercised in admitting the tapes because the tapes were generally audible, and, even if inaudible in parts, such inaudibility would go only to the weight, a jury question, rather than the admissibility,

of the identification evidence and the tapes themselves.

■ The translation question was disposed of by *Zambrana* itself. In considering the accuracy of the translation transcripts used there we stated:

"In our view, a foreign translation is sufficiently accurate to assist the jury if the translation reasonably conveys the intent or idea of the thought spoken. It is axiomatic that a translation of most foreign languages to English (and vice versa) can never convey precisely and exactly the same idea and intent comprised in the original text, and it is unrealistic to impose an impossible requirement of exactness before allowing a translation to be considered by a jury.... Rather than excluding the use of transcripts containing translations of foreign language to English, it is more properly the function of the finder-of-fact to weigh the evidence presented by the parties as to the accuracy of the proffered translation and to determine the reliability of the translation on the basis of that evidence."

(Citations and footnotes omitted). Applying this standard the *Zambrana* court upheld the use of translated transcripts in a case in which testimony and cross-examination was permitted of all witnesses, including expert witnesses on language translation. Here the same opportunity existed, as cross-examination was freely permitted and expert witnesses on language translation were offered. Thus, the trial judge did not abuse his discretion in allowing the tapes to be admitted and the translated transcripts to be used as an aid to the jury.

Finally, we would note that it is often wise practice for the government to obtain voice exemplars as a means for ensuring a clear identification of a defendant. However, such voice exemplars may not always be readily obtained and are not the only permissible means of voice identification. In this case, for example, the government withdrew its request for voice exemplars because Judge Kanne, who had been presiding over the previous Zambrana cases, had denied the government's motions for voice exemplars in those cases. Thus, the government made a reasoned tactical decision that the trial court was unlikely to permit it to obtain Vega's voice exemplar. The government's method of identifying Vega's voice conformed to the requirements of the United States Constitution and the Federal Rules of Evidence and the identification must be upheld.

## V.  ADMISSION OF TAPES WHERE ALL THE VOICES ON THE TAPES WERE NOT IDENTIFIED

■ Vega claims that the court should not have admitted certain tapes. He contends that these tapes were not sufficiently authenticated under Rule 901(a) of the Federal Rules of Evidence because they involved a speaker or speakers that were not specifically identified.[7]

In addressing this claim the trial judge was required to determine whether evidence was sufficient to support a finding that the matter in question was what the government claimed. Federal Rule of Evidence 901(a) provides: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims." In making this determination, the trial court was required to exercise its discretion in determining whether the government established by "clear and convincing evidence that the recordings are 'true, accurate and authentic recording[s] of the conversation[s], at given time[s], between the parties involved.'" *United States v. Keck*, 773 F.2d 759, 766 (7th Cir.1985) (quoting *United States v. Faurote*, 749 F.2d 40, 43 (7th Cir.1984)). As we noted previously, this was a question on which a trial judge exercises "broad discretion" which will "ordinarily not be overturned on appeal absent 'extraordinary circumstances.'" *Faurote*, 749 F.2d at 43.

Vega fails to make a compelling argument for exclusion of the tapes on this basis. As indicated previously, the authen-

---

**7.**  Vega does not challenge the admission of      these tapes on a hearsay basis.

tication standard is that the conversation be what the government claims it to be. *See* Federal Rule of Evidence 901(a). With respect to the tapes containing voices of speakers other than Vega, who were not specifically identified at trial, if the government's case does not depend upon any claim concerning the identity of that speaker, the tape can be admitted even in the absence of an identification of that speaker. For example, if it is only important to the government's case that Felipe Vega and Jesus Zambrana are speaking on a particular tape, the presence on the tape of other individuals who are not pertinent to the case and who are not identified, does not affect the admissibility of the tape.

Addressed in this fashion, it is clear that specific identification of a number of the individuals present on the tapes was unnecessary to the government's case. All of the calls in this case were made to the Zambrana residence, the headquarters of the drug conspiracy. The persons whose identity Vega questions were, in general, individuals or couriers who answered the telephone, paged an individual significant to the government's case or served as conduits for relayed messages to such persons. In this context, their role is similar to a hotel operator or bellhop, whose identity would be unnecessary to a case premised on a telephone conversation between a hotel guest and another individual in question.

The only individual other than Felipe Vega whose voice identification is questioned and whose identification could have been helpful to the government's case is Felipe Vega's wife. However, the trial judge initially and the jury, ultimately, could very easily have identified Mrs. Vega not only from her self-identification but also from circumstantial evidence. *See United States v. Puerta Restrepo*, 814 F.2d 1236, 1239 (7th Cir.1987) ("The authentication may be established by circumstantial evidence such as the similarity between what was discussed by the speakers and what each subsequently did"). In addition to Mrs. Vega's own self-identification, she was specifically recognized on a taped conversation by Jesus Zambrana as Vega's wife. In their conversation, when Zambrana was satisfied that she was Vega's wife, he gave her permission to "come by," a privilege which undoubtedly would have been denied in the drug culture if there was a question as to her identity. Further, Mrs. Vega referred to events (a trip to Puerto Rico and a wedding) which her husband had spoken about in his conversation with Jesus Zambrana a few days earlier. In addition, her conversation took place just days after a series of phone calls of inquiry from Felipe Vega to the Zambranas asking if there was "nothing yet" in a manner virtually identical to that which Mrs. Vega utilized in her telephone call. Based upon the totality of the circumstances, including Mrs. Vega's self-identification, Jesus Zambrana's obvious recognition of Mrs. Vega's voice, her specific reference to events discussed by her husband in a preceding phone call, as well as the timing of her call, an identification of Mrs. Vega's voice on the tape was clearly appropriate. Accordingly, we agree with the district court judge and conclude that his exercise of discretion was proper in his admission of the challenged tapes.

## VI. SUFFICIENCY OF THE EVIDENCE

Vega claims that the government's evidence was insufficient to sustain his convictions.

In a combination §§ 841(a), 846 case "the government must prove that [Vega] knew of the conspiracy to [distribute drugs] and that he intended to join and associate himself with its criminal design and purpose." [8] Since the jury found Vega guilty of the charges brought, his burden in overturning the verdict on appeal is a heavy one. *See United States v. Nesbitt*, 852 F.2d 1502,

---

**8.** *United States v. Nesbitt*, 852 F.2d 1502, 1509 (7th Cir.1988) (quoting *United States v. Griffin*, 827 F.2d 1108, 1117 (7th Cir.1987), *cert. denied*, — U.S. ——, 108 S.Ct. 1085, 99 L.Ed.2d 243 (1988)). Proof of the violation of 21 U.S.C. § 843(b) will require the additional element of use of a communication facility in furtherance of the conspiracy.

1509 (7th Cir.1988). We have summarized this burden in the following fashion:

> "This court has, on numerous occasions, had the opportunity to review convictions for violation of 21 U.S.C. §§ 841(a)(1), 846. As we have previously stated, and again reiterate, when reviewing the sufficiency of evidence to establish a conspiracy to possess with intent to distribute narcotics, we will affirm the trial court unless the evidence viewed in the light most favorable to the Government, could not have persuaded an [sic] rational trier of fact of defendant's guilt beyond a reasonable doubt."

*Nesbitt,* at 1509 (quoting *United States v. Mayo,* 721 F.2d 1084, 1087 (7th Cir.1983)).

Several specific legal propositions inherently flow from this general statement. As an initial matter, "we review all the evidence and all the reasonable inferences that can be drawn from the evidence in the light most favorable to the government." *Nesbitt,* 852 F.2d at 1509 (quoting *United States v. Pritchard,* 745 F.2d 1112, 1122 (7th Cir.1984)). "Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original) (footnote omitted). "This [standard] includes, in conspiracy cases, circumstantial as well as direct evidence." *United States v. Williams,* 858 F.2d 1218, 1221 (7th Cir.1988). We determine "whether, after viewing the evidence in the light most favorable to the government, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319, 99 S.Ct. at 2789 (emphasis in original). As we emphasized in *United States v. Giangrosso,* 779 F.2d 376, 382 (7th Cir.1985): *"[T]his court is not the trier of fact and we are required to uphold the jury's verdict where 'any rational trier of fact' could have found the defendant guilty of the crime."* Most importantly for this case: *"Only when the record contains no evidence, regardless of how it is weighed, from which the [trier of fact] could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict."* *Nesbitt,* 852 F.2d at 1509 (quoting *United States v. Whaley,* 830 F.2d 1469, 1472 (7th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988) which quoted, in turn, *United States v. Moore,* 764 F.2d 476, 478 (7th Cir.1985)) (emphasis added).

■ Circumstantial evidence may appropriately be utilized to demonstrate both a conspiracy and the defendant's participation in the conspiracy. *See Nesbitt,* 852 F.2d at 1509. As we observed in *Nesbitt,* at 1510:

> " '[I]t is perfectly legitimate to prove a conspiracy by circumstantial evidence.' [*United States v. Griffin,* 827 F.2d 1108, 1116 (7th Cir.1987), *cert. denied* [—— U.S. ——], 108 S.Ct. 1085 [99 L.Ed.2d 243] (1988) ]. By its very nature, a conspiracy 'is conceived and carried out clandestinely, and direct evidence of the crime is rarely available. Thus, circumstantial evidence from which the jury could reasonably infer the existence of an agreement is permissible.' [*United States v. Mayo,* 721 F.2d 1084, 1088 (7th Cir. 1983) ] (quoting *United States v. Washington,* 586 F.2d 1147, 1153 (7th Cir. 1978) (sic)). *See also United States v. Marquardt,* 786 F.2d 771, 780 (7th Cir. 1986) ('Circumstantial evidence is of equal probative value to direct evidence')."

This observation reflects the same experience with drug conspiracies which led us to state: "[R]elying on common sense and taking judicial notice of the clandestine and life-threatening manner in which a drug conspiracy operates, it is ridiculous to presume that the government could obtain witnesses with firsthand knowledge of the group's activities." *Zambrana,* 841 F.2d at 1331–32. The important role that circumstantial evidence can play in a drug conspiracy case is perhaps best summarized by our recent statement that: "Not only is the use of circumstantial evidence permissible, but 'circumstantial evidence "may be the *sole support* for a convic-

tion.'"'" *Nesbitt*, 852 F.2d at 1510 (quoting *United States v. Williams*, 798 F.2d 1024, 1042 (7th Cir.1986) (dissenting opinion) which quoted, in turn, *United States v. McCrady*, 774 F.2d 868, 874 (8th Cir.1985)).

In *Nesbitt* we went on to observe: "We recognize that in reviewing a guilty verdict based on circumstantial evidence, we must insure that the verdict does 'not rest "solely on the piling of inference upon inference"; but neither should we view every bit of evidence in isolation.' *United States v. Guzzino*, 810 F.2d 687, 696–97 (7th Cir.1987), *petition for cert. filed*, (March 27, 1987) (citing *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir.1983), *cert. denied*, 467 U.S. 1216, [104 S.Ct. 2661, 81 L.Ed.2d 367] (1984)). But '[t]he view that the prosecution's case must answer *all* questions and remove *all* doubts ... of course, is not the law because that would be impossible; the proof need only satisfy reasonable doubt.' *Borum v. United States*, 380 F.2d 595, 599 (D.C. Cir.1967) (former Chief Justice Burger dissenting)."

852 F.2d at 1511 (emphasis in original). As we further noted in *Nesbitt:* "If the government proves its case by circumstantial evidence, 'it need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt.' ... The trier of fact is free to choose among various reasonable constructions of the evidence." *Id.* at 1510 (quoting *United States v. Radtke*, 799 F.2d 298, 302 (7th Cir.1986)). This statement is based upon our recognition that "[i]n every criminal trial, each party asks the trier of fact to believe its witnesses, to weigh its evidence more heavily than the opposition's evidence, and to draw certain inferences from the basic facts in evidence in order to accept its hypothesis regarding the events in dispute." *United States v. Allen*, 797 F.2d 1395, 1399 (7th Cir.1986) (quoting *United States v. Moya*, 721 F.2d 606 (7th Cir.1983), *cert. denied*, 465 U.S. 1037, 104 S.Ct. 1312, 79 L.Ed.2d 709 (1984)).

Review of a verdict based upon circumstantial evidence also requires special def-

erence to a jury's common sense. As we stated in *Nesbitt*, 852 F.2d at 1511:

"Juries are allowed to draw upon their own experience in life as well as their common sense in reaching their verdict. *See* [*United States v. Radtke*, 799 F.2d 298, 302 (7th Cir.1986)]. While '[c]ommon sense is no substitute for evidence, ... common sense should be used to evaluate what reasonably may be inferred from circumstantial evidence.' *Id.* Likewise, a reviewing court must '"use its experience with people and events [in determining] that the evidence correctly points to guilt [to guard] against the possibility"' of affirming a guilty verdict based solely on an '"innocent or ambiguous inference."' *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir.1983), *cert. denied*, 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984)] (quoting *United States v. Kwitek*, 467 F.2d 1222, 1226 (7th Cir.), *cert. denied*, 409 U.S. 1079 [93 S.Ct. 702, 34 L.Ed.2d 668] (1972))."

In addition, we defer to the jury's determination of witnesses' credibility. As we noted in *United States v. Ramirez*, 796 F.2d 212, 214 (7th Cir.1986): "An appellate court will not weigh the evidence or assess the credibility of the witnesses." Similarly, we have stated: "'It is well settled law that a court of appeals does not stand in judgment of the credibility of witnesses. Rather that question is left to the sound discretion of the trier of fact.'" *United States v. Perry*, 747 F.2d 1165, 1170 (7th Cir.1984) (quoting *United States v. Roman*, 728 F.2d 846, 856 (7th Cir.1984)). Finally, "the credibility of witnesses is peculiarly within the province of the jury and our review of credibility is prohibited absent extraordinary circumstances." *United States v. Noble*, 754 F.2d 1324, 1332 (7th Cir.1985).

■ Applying these standards to this case, there is little question that a rational jury could and did determine beyond a reasonable doubt that there existed a conspiracy to distribute cocaine and to possess cocaine with intent to distribute. Evidence was introduced of an April 1985 cocaine

shipment intended for the Zambranas, a possible June 1985 shipment to the Zambranas, Vega's telephone calls to the Zambranas to obtain cocaine, telephone calls made to the Zambranas to obtain cocaine and/or marijuana between April and June 1985, and the resale of cocaine purchased from the Zambranas between February and August 1985 by Tom Lovely, a member of the conspiracy. A finding beyond a reasonable doubt that a combination of ʻ ʊ or more persons was formed for accomplishment of the alleged criminal purposes through joint efforts was made upon this evidence. *See Nesbitt*, 852 F.2d at 1509–10. Indeed, we have previously affirmed a determination by a trial judge in the context of an evidentiary ruling that this drug conspiracy was a conspiracy under the relevant federal statutes. *See United States v. Zambrana*, 841 F.2d 1320, 1343–47 (7th Cir.1988).

The only question remaining is whether the evidence supports the verdict "that [Vega] ... joined and participated in the conspiratorial scheme." *Nesbitt*, 852 F.2d at 1509 (quoting *United States v. Garcia*, 562 F.2d 411, 414 (7th Cir.1977)). This court has noted that

"Participation in a criminal conspiracy may be shown through circumstantial evidence. Circumstantial evidence may include whether the defendant has a stake in the outcome of the conspiracy. Once a conspiracy is shown to exist evidence that establishes a particular defendant's participation beyond a reasonable doubt, although the connection between the defendant and conspiracy is slight, is sufficient to convict. Most important in this case is the well-established rule that mere association, knowledge or approval of a conspiracy is not sufficient to prove a defendant's guilt. However, while 'mere presence at the scene of the crime or mere association with conspirators will not themselves support a conspiracy conviction ... presence of a single act will suffice if the circumstances permit the inference that the presence or act was intended to advance the ends of the conspiracy.' *United States v. Mancillas*, 580 F.2d 1301, 1308 (7th Cir.), *cert. denied*, 439 U.S. 958 [99 S.Ct. 361; 58 L.Ed. 2d 351] (1978)."

*United States v. Xheka*, 704 F.2d 974, 988–89 (7th Cir.1983) (citations omitted).

The fact that tapes of the conversations implicating Vega in the drug conspiracy may, in certain parts, have been somewhat unclear, does not preclude a determination that he participated in the conspiracy. As we observed in *United States v. Zanin*, 831 F.2d 740, 744 (7th Cir.1987): "Conversations regarding drug transactions are rarely clear. A fact-finder must always draw inferences from veiled allusions and code words." In this case the jury was confronted with conversations which contained "code words" that, when considered in isolation, might seem unclear, veiled and almost nonsensical, but when analyzed properly, in the context of the totality of the evidence, can be clearly seen to be "code words" for drugs. *See generally United States v. Abascal*, 564 F.2d 821, 827 (2nd Cir.1977) ("The conversing conspirators frequently discuss non-narcotic-related matters at the beginning of conversations, and often resorted to jargon and code words, a frequent practice in narcotics dealings"); *United States v. Chavez*, 533 F.2d 491, 494 (9th Cir.1976) ("Jargon and code words are commonly used by those dealing in illicit drugs and were employed here") (citation omitted). It is true that, advisedly, no explicit mention was ever made of cocaine or other drugs in any of Vega's conversations with the Zambranas. However, a case was made, which was more than strong enough to convince the jury, the trier of fact, that Vega used terms like *"chickens," "roosters "* and *"it "* as code words for drugs. Not only are code words always used by drug conspirators when they realize, as they do in today's drug culture, that their telephone conversations are frequently intercepted, such terms were obviously used by the conspirators in this case. Tom Lovely, a convicted member of the Zambrana conspiracy, testified clearly and without qualification that he had been instructed to use code words for drugs when speaking on the telephone. He gave *"chicken "* as an example of a code word which could have

been used and furthermore Vega, who the jury found to be a member of this same conspiracy, used this code word. Antonio Dominguez additionally appeared to use a code word *"uncle"* in a conversation with the Zambranas. Vega's wife also used cryptic terms in speaking with the Zambranas which the jury may very well have interpreted as code words for drugs. Vega's own conversations with the Zambranas were laced with possible drug code words, such as *"chickens," "roosters"* and *"it."* When one considers the use of these code words in light of the totality of the circumstances, including the correlation between the timing of Vega's conversations with the Zambranas, the April drug shipment and the possible June drug shipment, the evidence of Vega's guilt becomes most convincing.

Had the jury believed Vega, they could have permissibly interpreted terms like *"chickens," "roosters"* and *"it"* in a literal fashion and determined that Vega actually was interested in the purchase and sale of chickens. However, the triers of fact, who had the opportunity to observe the demeanor and character of all of the witnesses, chose not to believe this explanation. As has already been noted, there was no evidence that either Vega or the Zambranas dealt in chicken sales. Further, it is clear that a possible innocent explanation for Vega's conversations does not affect the validity of the jury's contrary conclusion. As we noted in *Zanin,* 831 F.2d at 745:

"Phyllis Zanin argues that all conversations in which she participated are susceptible to an innocent explanation. This may or may not be true—but it is irrelevant. The existence of an innocent explanation does not foreclose a jury from finding guilt beyond a reasonable doubt. The jury was entitled to draw reasonable inferences from the conversations."

**9.** A determination of Vega's clear intent to distribute cocaine could have been based upon his April 11, 1985, statement that one of the chickens was for another person, when considered with all of the other evidence presented to the jury. Further, based upon all of the inculpatory inferences which can reasonably be drawn from

Similarly, given the choice between the various inferences in this case the "jury exercising well-reasoned judgment could very well conclude that the inculpatory inferences outweigh the exculpatory inferences that could be drawn from the evidence beyond a reasonable doubt." *Nesbitt,* 852 F.2d at 1511. In such a situation, a reasonable jury did determine that Vega knew of the conspiracy to distribute cocaine and to possess cocaine with intent to distribute and joined and participated in these criminal purposes.[9]

The reasonableness of the jury's verdict based upon these inferences is most clear when one considers the evidence before it:

1.  Felipe Vega made eight telephone calls to the Zambrana residence, the central location of the drug conspiracy from March 21, 1985 to April 30, 1985 and from June 14, 1985 to June 28, 1985. During these periods the Zambrana drug conspiracy was ongoing and flourishing, and Vega frequently spoke with Jesus Zambrana, a significant member of the drug conspiracy.

2.  Felipe Vega's March 21, 1985 request that Jesus Zambrana get him four *"chickens,"* obviously a code word for drugs.

3.  Felipe Vega's March 29, 1985 call to the Zambrana residence concerning exchanges of *"chickens"* and *"roosters,"* code words for drugs.

4.  Felipe Vega's April 11, 1985 request for four *"chickens"* with one *"chicken"* being for another person, again utilizing code words for drugs.

5.  The April 25, 1985 capture of a drug shipment to the Zambrana residence, shortly after these conversations had taken place.

6.  An April 30, 1985 statement by Vega that *"it"* was good, apparently referring to drugs.

Vega's April 11, 1985, conversation, which took place over a telephone, a communication facility under the statute, the jury obviously determined that this conversation was the use of a communication facility in the conspiracy necessary for its verdict that Vega violated 21 U.S.C. § 843(b).

7. Jesus Zambrana's June 14, 1985 statement to Vega that they were *"still waiting,"* likely referring to a drug shipment.

8. Jesus Zambrana's June 18, 1985 statements to Vega, again likely concerning a drug shipment. Zambrana told Vega that they were *"still waiting for (unintelligible) of the passage"* and that he would *"let [Vega] know when."* In the same conversation Zambrana later told Vega, in response to Vega's question *"Will it arrive?"* that Zambrana did not know for sure and that he would let Vega *"know as soon as I hear when they will get here."*

9. Jesus Zambrana's June 21, 1985 statement that they were *"waiting,"* apparently for a drug shipment.

10. Antonio Dominguez' statement to Jesus Zambrana on June 23, 1985, asking whether his *"uncle"* had left, likely referring to the transportation of the awaited drug shipment.

11. Vega's June 28, 1985 inquiry of Zambrana as to when Zambrana was going to *"take care"* of him, referring to a drug shipment.

12. The conversation between Mrs. Vega and Zambrana in which Mrs. Vega asked *"Nothing yet?"* and Zambrana responded, *"the associate is leaving in the evening."* This was followed by arrangements to pick up merchandise, likely drugs, at Zambrana's house and a request by Mrs. Vega, *"With the wedding, give me four"* nonsensical language which might involve code words for drugs.

13. The testimony of Tom Lovely, a member of the Zambrana drug conspiracy, that the Zambranas required use of code words for drugs on the telephones and that *"chicken"* was an example of a possible code word.

14. The absence of any evidence that Vega or the Zambranas dealt in the buying and selling of chickens.

The combination of these items of evidence clearly establishes that Vega was involved in the drug conspiracy. His calls to the Zambranas were frequent, laced with code words for drugs and made closely proximate to drug delivery times. On the basis of all the evidence, the jury appropriately found that Vega was a part of the Zambrana drug conspiracy.

The reasonableness of the jury's conclusion that Vega was involved in the drug conspiracy is confirmed by a previous case in which we found that repeated intercepted telephone conversations with drug conspirators in code language strongly supported a jury finding that a defendant was involved in a drug conspiracy. In *United States v. Ramirez*, 796 F.2d 212, 215 (7th Cir.1986), we stated:

"[T]he evidence introduced at trial showed that Ramirez made four telephone calls either to or from the Cordobas' home telephone within a ten day period. ... He spoke with at least four different members of the conspiracy, and the conversations themselves involved some kind of code language. Witnesses at the trial explained that the nonsensical language employed by the conversants was a code for illegal drugs, and that the discussions focussed on drug negotiations or travel arrangements to facilitate the same. In addition, the evidence established that he had a close personal relationship with one of the conspirators.... The numerosity and detail of Ramirez's conversations, as well as his unusual travel agenda, connections with one of the primary conspirators, and the testimony of the agents, constitute sufficient evidence under the *Jackson v. Virginia* standard to establish that Ramirez knowingly participated in a conspiracy to distribute cocaine. In addition, these same considerations establish that Ramirez's participation was neither innocuous nor isolated."

(footnote omitted). Vega had the same type of frequent conversations with members of a drug conspiracy as did Ramirez. He telephoned the residence from which the conspiracy operated at least eight times during periods when the conspiracy was thriving. While speaking he frequently used code words for drugs. From the context of the recorded conversations, it seems clear that Vega knew at least one of the

other conspirators well, had a motive to join in the conspiracy's ends, and could have been determined to have had a stake in the conspiracy. *See United States v. Williams*, 858 F.2d 1218, 1222 (7th Cir. 1988) ("We cannot conclude, based on this evidence, that no rational trier of fact could have convicted Williams of conspiracy to obstruct justice. The evidence shows that Williams knew the other conspirators well and certainly had a motive to join, and a stake in the outcome of, the conspiracy"). Thus, *Ramirez* strongly supports the jury's inferences that Vega was involved in the drug conspiracy.

The permissibility of the jury's verdict based upon these inferences is further supported by other drug conspiracy cases in which we have sustained decisions based upon similar inferences. For example, we have frequently upheld conspiracy determinations made by judges and juries which have relied upon inferences that "code words" or obscure language were meant to refer to drugs. In *United States v. Mayo*, 721 F.2d 1084, 1088–89 (7th Cir.1983), we sustained a conviction based, in part, upon evidence of the use of code words:

> "Still further evidence of Mayo's participation is found in Mayo's conveying Shapeley to the Miami airport on October 22, 1980, so that Shapeley could return to Michigan, supplying Shapeley with and instructing him to use a list of code words whenever discussing cocaine dealings over the telephone, and arranging to remain in contact with Shapeley once he returned to Michigan."

Likewise in *United States v. Zambrana*, 841 F.2d 1320, 1346 (7th Cir.1988), we sustained a trial judge's finding of the existence of the same drug conspiracy involved in this case. This finding was based in part on the use of "code words" for drugs. We stated: "Although the word 'cocaine' was never referred to in any of the conversations, the trial judge could properly have accepted the government's contention that phrases such as 'metallic paint' were used as code words to allude to the illegal

drugs." *Id.* Probably the clearest support for the jury's inferences may be found in *United States v. Giangrosso*, 779 F.2d 376, 381–82 (7th Cir.1986). The jury in that case determined that an individual was involved in a drug conspiracy based upon the timing of telephone conversations and the use of evasive code language frequently utilized in the drug culture during these conversations, when these matters were considered together with other evidence presented. In sustaining one conviction we quoted terse language utilized in a telephone conversation and noted that: "The timing of the phone conversations and the discussion of the address immediately preceding the delivery of the cocaine to the Post Office is persuasive evidence linking Giangrosso to the cocaine delivery." *Id.* at 382. In sustaining the conviction on the other count, we again referred to the same combination of the correlation between drug delivery dates and telephone conversations using evasive language, in our consideration of the entire evidence. We observed: "[I]mmediately preceding the August 16, 1983, delivery of the Express Mail package to Chicago, a conversation took place between Giangrosso and Kucala *couched in evasive language, obviously to avoid the mention of cocaine.*" *Id.* (emphasis added). Clearly, the jury in this case did properly render guilty verdicts based upon inferences concerning Vega's use of "code words" for drugs and the timing between Vega's conversations and possible drug deliveries.

A decision of another court of appeals very strongly supports the jury's verdict. In *United States v. Perez*, 824 F.2d 1567 (11th Cir.1987), the United States Court of Appeals for the Eleventh Circuit upheld a trial judge's evidentiary determination of an individual's involvement in a conspiracy under a factual situation almost identical to that involved here.[10] In that case 300 kilograms of cocaine were unloaded from an airplane. The court noted:

---

**10.** It should briefly be noted that this decision was under the preponderance of the evidence standard used to determine membership in a

conspiracy for purposes of Federal Rule of Evidence 801(d)(2)(E).

"After being advised that the plane had landed safely, Kurtz, still at Sikaffy's residence, called his wife and excitedly advised her that 300 'babies' had come in and that he would be coming home with a couple of them. Kurtz then made a second call to another woman to advise her that he had '300 white leg horns' 'all full-sized chicks' that had all 'hatched.' Subsequently, Kurtz was advised by Gerard Latchinian that there would be no movement of the 'flowers' that night."

*Id.* at 1570–71. In describing Kurtz's contentions, the court stated:

"Appellant Kurtz, who during the course of this matter was recorded as making references to 'chicks,' '300 white leg horns,' and '300 babies,' defended on the grounds that he intended to start a chicken farm. His wife testified that her husband had always talked about raising chickens but that he had never in their 28 years of marriage purchased any. Kurtz also put a long-time friend on the stand, Odell Beard, who testified that when Kurtz called her about the 300 babies she thought he was talking about raising fighting chickens. Beard, however, did concede that she seldom believed Kurtz except when he told her he loved her."

*Id.* at 1571–72. The court concluded:

"In regard to appellant Kurtz, independent evidence shows that Kurtz and Cymerman tested the aircraft that was ultimately used to import the load of cocaine. In the intercepted phone conversations made after he received a coded message that the 300 kilos had arrived, Kurtz advised his associates that he would be arriving with a couple of them. The discredited testimony that he was going to raise chickens is unavailing. The independent evidence of conspiracy readily met the [*United States v. James,* 590 F.2d 575 (5th Cir.) (en banc), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979)] standard."

*Id.* at 1573. In this case the jury was confronted with a very similar factual situation. *"Chickens"* were used as code words for drugs in a case in which, in response to the briefs and arguments on this point on appeal, there was no evidence that those who bought and sold drugs also dealt in purchases or sales of chickens or roosters. The jury construed the facts in a manner virtually identical to the trial judge of the Eleventh Circuit upheld in *Perez,* and should be upheld here.

Vega has gone to great lengths to undermine the jury's verdict. He has even introduced factual material to this court, such as the Puerto Rican practices of purchasing live poultry for consumption, engaging in cock fighting and stuffing chickens, that was not introduced to the jury at trial in an attempt to have us overturn the jury's determination.[11] However, if we were to conclude that a rational jury could not convict Vega under these facts, we would essentially grant immunity to any individual who used code words in purchasing drugs. An illustration of how this could occur can be drawn from two Wisconsin cases, *State v. Droste,* 115 Wis.2d 48, 50, 339 N.W.2d 578 (1983), and *May v. State,* 97 Wis.2d 175, 293 N.W.2d 478 (1980), which involved factual situations presenting purchases of certain amphetamines, "commonly referred to on the streets as 'black cadillacs.'" *Droste,* 115 Wis.2d at 50, 339 N.W.2d 578. In *May* an undercover police officer sought to purchase "black cadillacs" from a drug dealer. The court stated, in pertinent part:

"The defendant said ... that in a couple of days he would have a quantity of 'black cadillacs' which are a stronger form of 'speed.' [The undercover agent] asked if he could stop by in a couple of days. The defendant indicated that he could and that if he had the 'black cadillacs,' they could make a deal.... Two days later [the undercover agent] went to the [defendant's] apartment ... and ... asked [the defendant's roommate] if the 'black cadillacs' which he had discussed with the defendant had arrived.... [The undercover agent later] telephoned the apartment.... When the

---

**11.** One must question, though, why it would have been necessary for Vega to expectantly wait for a shipment of chickens during the entire month of June if the Zambranas were raising chickens on their Indiana farm.

defendant came to the phone, [the undercover agent] asked him if he had the 'black cadillacs,' and the defendant said he did, but that he had only ten of them. The defendant said the price was $3.50 a piece and that [the undercover agent] could come over and get them. [The undercover agent] arrived at the apartment ... and he said he was the person interested in the 'black cadillacs.' [The defendant's roommate] showed the capsules to [the undercover agent] and he said he was only interested in the 'black cadillacs' and wanted ten of them. [The defendant's roommate] took the black capsules from the container, wrapped them in plastic wrap and gave them to [the undercover agent], who gave her $35."

If Vega's theory were applied to the code language used in the above cases, a person who used the words "black cadillac" as code words for drugs in ordering narcotics from an individual or business which sold both cars and drugs could not be convicted of a drug violation. Such a wooden construction would ignore the basic precept that "[j]uries are allowed to draw upon their own experience in life as well as their common sense in reaching their verdict." *Nesbitt*, 852 F.2d at 1511. We decline to undermine the role of the jury in the manner Vega suggests.

Essentially Vega's argument in this case is directed toward his disagreement with the jury's verdict. However, we would remind Vega of our recent observation concerning our role in reviewing a jury's verdict on the basis of insufficiency of evidence: "All we can ask—under *Jackson* all we may ask—is whether, assuming the jury resolved all disputes in the state's favor and drew all inferences from that evidence, it would have been rational to convict. Not whether we would convict, but whether thoughtful people could convict." *Branion v. Gramly*, 855 F.2d 1256, 1266 (7th Cir.1988). In this case we cannot say that the jury acted irrationally in convicting Vega.

## VII. SENTENCING

▆▆ Vega finally contends that the district court improperly considered the new federal sentencing guidelines in sentencing him. Because Vega's sentencing took place prior to the effective date of the guidelines, Vega believes that the court's use of these guidelines violates the constitutional protection against *ex post facto* laws.

It is well settled that "a trial judge in the federal system generally has wide discretion in determining what sentence to impose." *United States v. Tucker*, 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972). In making this discretionary determination "a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." *Id.* It follows that " '[a] sentence which is within the limits established by statute under which it is imposed will not be vacated upon review unless the sentencing judge relied upon improper considerations or unreliable information in exercising his discretion or failed to exercise any discretion at all in imposing the sentence.' " *United States v. Ford*, 840 F.2d 460, 466 (7th Cir.1988) (quoting *United States v. Harris*, 761 F.2d 394, 402–03 (7th Cir.1985)).

If the district court had indicated that it was bound in any way by the federal sentencing guidelines, Vega's *ex post facto* law claim might have more substance. However, the court repeatedly indicated that it was merely influenced and not compelled by the guidelines. It was entirely proper for the district court's sentencing discretion to be guided in part by the sentencing parameters of the new guidelines. *See United States v. Bullock*, 857 F.2d 367, 372 (7th Cir.1988) (Sentencing was proper in a case in which the judge "stated that he consulted the Sentencing Commission's Preliminary Guidelines in imposing [the defendant's] sentence" but articulated several factors, in addition to the sentencing guidelines, in support of the sentencing determination). *Cf. United States v. Hanahan*, 798 F.2d 187, 191 (7th Cir.1986) (Sentencing was upheld in a case in which the

trial court looked at the sentencing provision of a later statute for guidance, but made clear that it was not sentencing the defendant under the later statute). Since the court treated the guidelines as advisory and imposed sentences which were within statutory limits, Vega's sentencing was proper.

Even if we were to lend a sympathetic ear to one of Vega's arguments, we would remind all involved that the Supreme Court has "repeatedly stated, 'the Constitution entitles a criminal defendant to a fair trial, not a perfect one.'" *Rose v. Clark*, 478 U.S. 570, 579, 106 S.Ct. 3101, 3107, 92 L.Ed. 2d 460 (1986) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986)). Since Vega received a fair trial in this case, the defendant's convictions and sentences are

AFFIRMED.