**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Joseph ADAMO, Defendant–Appellant.**

**No. 87–2934.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 8, 1989.

Decided Aug. 16, 1989.

As Amended Aug. 21, 1989.

---

**1220**

Bridget Madigan, Giffin, Winning, Lindner, Cohen and Bodewes, Springfield, Ill., Anthony J. Servino, Hartsdale, N.Y., for defendant-appellant.

J. William Roberts, U.S. Atty., Springfield, Ill., K. Tate Chambers, Darilynn J. Knauss, Asst. U.S. Attys., Peoria, Ill., for plaintiff-appellee.

Before WOOD, Jr., POSNER and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

The defendant-appellant Joseph Adamo appeals his conviction for conspiracy to distribute cocaine in violation of 21 U.S.C. § 846. We affirm.

### I.

Special Agent F.T. Simmons of the Illinois State Police, Division of Criminal Investigation, while assigned to undercover work in Peoria, Illinois, discovered a cocaine distribution network operating from the state of New York and servicing buyers in Peoria. The grand jury indicted Eric Reneau, Vicky Clark and Beth Young (buyers-Peoria) as well as the New York suppliers (the appellant Adamo, Paul Cozzolino, William Pizzolongo, Ralph Cava, Lisa DiPalo, Steve Gargano and Tito Lnu). All of the defendants, except Adamo, entered guilty pleas prior to trial. Adamo was tried and convicted of one count of conspiracy to distribute cocaine and was sentenced to a prison term of fifteen years.

At trial, the government presented the testimony of Agent Simmons and Richard DiFillippo, the New York FBI agent who executed a search warrant on Adamo's apartment. In addition, co-conspirators Cozzolino, Pizzolongo, Cava and Gargano testified against Adamo pursuant to their plea agreements with the government. Adamo neither testified nor presented any witnesses on his behalf.

### FACTS

On January 15, 1987, Special Agent Simmons, using the pseudonym "Ty," was introduced to Vicky Clark in Peoria, Illinois.[1] Clark told Agent Simmons that an acquaintance of hers, Paul Cozzolino, was shipping cocaine from his home in New York to Eric Reneau, a friend of Clark's living in Peoria.

---

1. At all relevant times, Vicky Clark and the other members of the cocaine distribution conspiracy knew Agent Simmons only as "Ty," but we will refer to him as Agent Simmons in order to avoid confusing him with members of the conspiracy.

Clark arranged for Agent Simmons to speak with Paul Cozzolino via telephone on February 3, 1987. During the February 3 conversation, Cozzolino agreed to sell Agent Simmons an ounce of cocaine for $1500 and advised Simmons that Eric Reneau could provide him with a sample of the drug. On February 18, 1987, after obtaining a cocaine sample from Reneau, Agent Simmons received an ounce of cocaine from Cozzolino through the United States mail. Thereafter, on or about February 26, 1987, Agent Simmons arranged to purchase a kilogram or "kilo" (2.2046 pounds) of cocaine from Cozzolino for approximately $25,000.[2]

Paul Cozzolino testified that he attempted to obtain a kilo of cocaine for Simmons from two known New York cocaine sources with whom he regularly dealt, but was unable to arrange a purchase. Near the end of April 1987, Cozzolino was reintroduced to the appellant Adamo, a boyhood acquaintance, through a mutual friend, Lisa DiPalo. According to Cozzolino, he told Adamo that he needed a kilo of cocaine, and Adamo stated that he could obtain a kilo for $26,000. Cozzolino, however, was unable to raise $26,000, so Adamo agreed to obtain half a kilo of cocaine for $12,000. To fund the purchase, Cozzolino borrowed $6,000 from William Pizzolongo and $6,000 from Ralph Cava.

According to Cozzolino, Pizzolongo and Cava's testimony, they met Adamo and Lisa DiPalo at Cozzolino's Mount Vernon, New York, delicatessen at 3 p.m. on April 29, 1987. Adamo and DiPalo then drove in Adamo's van to a Bronx apartment building, with Cozzolino following in his car, and Cava and Pizzolongo following in Pizzolongo's car. Upon arrival in the Bronx, Cozzolino gave Adamo the $12,000, and Adamo entered the apartment building. Approximately an hour later, a dark-skinned man, whom Cozzolino, Pizzolongo and Cava described as a "Colombian," arrived and entered the building. After another hour, the

dark-skinned man, and then Adamo, departed the apartment building. Cozzolino testified:

"We asked him [Adamo], 'Did you get the stuff?' and he says, 'No, there was a discrepancy about the money. It wasn't enough. So you're going to get a little shorter than what you expected.... Follow me back to my house. I brought an ounce with me. I got a sample of the stuff that you will be getting.'"

Cozzolino and Cava testified that they went to Adamo's apartment at 6 p.m. that evening (April 29), along with Adamo and Lisa DiPalo, and all but Cava ingested cocaine. Between 7 and 9 p.m. Adamo made a phone call, left the apartment, and returned at 10 p.m. with a paper bag containing approximately 16 ounces of cocaine. Upon Adamo's return, Cozzolino went into the kitchen to sample the cocaine, at which point (according to Cozzolino) Adamo told Cozzolino:

"Listen to me. I'll tell you what to do now.... Never have the money and the cocaine in the same place at the same time.... When you go to the airport, always keep it on your body. Don't keep it in the bag because you'll have a better chance getting into the airport if it is on your body."

Cozzolino also testified that sometime during the evening of April 29 he "told Joe [Adamo] who Ty[3] was, the guy in Chicago, where [the] cocaine was going to." He further testified that Adamo stated: "Want to do me a favor? Call up the guy that you're bringing the cocaine to and give him my phone number. So that, you know, if he wanted you, he could get in touch with you." Cozzolino later telephoned "Ty" (Agent Simmons) and left Adamo's telephone number on Simmons' answering machine.

Cozzolino and Cava stated that they left Adamo's apartment at 10:30 p.m. on April 29 with the cocaine purchased from Adamo.

---

**2.** The government tape recorded and transcribed Agent Simmons' February 26, 1987, telephone conversation with Cozzolino and also recorded and transcribed a number of other phone calls between Agent Simmons (in Peoria, Illinois) and Cozzolino and other coconspirators (in New York).

**3.** "Ty" was Agent Simmons' pseudonym.

They proceeded to Cava's apartment and stored the cocaine in Cava's refrigerator. On April 30, 1987, Agent Simmons received a tape-recorded telephone message to contact Cozzolino at the New York telephone number listed under Adamo's name. He stated that he called the number on April 30, expecting to contact Cozzolino, but instead spoke with someone who identified herself as Lisa DiPalo, and according to the record was at that time living with Adamo.[4]

On or about May 2, 1987, Cozzolino, Pizzolongo and Cava divided the cocaine they had purchased from Adamo into three separate bags and decided they would personally deliver one of the six-ounce bags of cocaine to "Ty" (Agent Simmons) in Peoria, Illinois. Cozzolino testified that their plan was to return to New York later and obtain another pound and a half of cocaine for "Ty," and that Adamo was to be the supplier. On May 4, Cozzolino, Cava and Pizzolongo flew from New York to Peoria with a plastic bag containing six ounces of cocaine sealed within a second plastic bag containing coffee grounds, in an attempt to conceal the cocaine odor. They met "Ty" (Agent Simmons) at the Peoria airport and proceeded to a hotel, where they were arrested while transferring the cocaine to Simmons. Cozzolino, Cava and Pizzolongo all testified that the appellant Adamo was the source of the cocaine delivered to Agent Simmons on May 4, 1987, in Peoria, Illinois.

### II.

Adamo challenges his conviction on the grounds that: (1) The evidence was insufficient to establish that he participated in the conspiracy to distribute cocaine; (2) He was deprived of his sixth amendment right to effective assistance of counsel when his defense counsel failed to make a number of evidentiary objections and further failed to call a necessary alibi witness; (3) Co-conspirator statements were improperly re-

ceived in evidence; (4) The trial court failed to give a "missing witness" jury instruction; (5) The prosecutor in his closing argument referred to facts not received in evidence, thereby denying Adamo his right to due process; and (6) The trial court committed error in admitting testimony regarding Adamo's personal use of cocaine and physical evidence of cocaine and drug paraphernalia. Adamo also alleges that the imposition of a 15–year prison sentence was excessive.

### SUFFICIENCY OF THE EVIDENCE

Initially, we turn to Adamo's challenge to the sufficiency of the evidence supporting his conviction for conspiracy to distribute cocaine. "In evaluating [Adamo's] sufficiency of evidence challenge, we note that [he] bears a heavy burden. Initially, we 'review all the evidence and all the reasonable inferences that can be drawn from the evidence in the light most favorable to the government.'" *United States v. Nesbitt,* 852 F.2d 1502, 1509 (7th Cir.1988) (quoting *United States v. Pritchard,* 745 F.2d 1112, 1122 (7th Cir.1984)). "The test is whether after viewing the evidence in the light most favorable to the government, '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Pritchard,* 745 F.2d at 1122 (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original)).

"As we emphasized in *United States v. Giangrosso,* 779 F.2d 376, 382 (7th Cir. 1985): '[T]his court is not the trier of fact and we are required to uphold the jury's verdict where "any rational trier of fact" could have found the defendant guilty of the crime.' ... 'Only when the record contains no evidence, regardless of how it is weighed, from which the [trier of fact] could find guilt beyond a reasonable doubt, may an ap-*

---

4. The government tape recorded and transcribed this and several other telephone conversations Agent Simmons had with DiPalo and Paul Cozzolino on April 30 and May 1, 1987, and both the tapes and the transcripts were received in evidence. Based on Agent Sim-

mons' testimony (neither the tapes nor the transcripts were made part of the record on appeal), it appears that during these conversations Agent Simmons made arrangements for the delivery of cocaine to Peoria from New York.

*pellate court overturn the verdict.'* *Nesbitt,* 852 F.2d at 1509 (quoting *United States v. Whaley,* 830 F.2d 1469, 1472 (7th Cir.1987), *cert. denied,* [— U.S. ——], 108 S.Ct. 1738 [100 L.Ed.2d 202] (1988) which quoted, in turn, *United States v. Moore,* 764 F.2d 476, 478 (7th Cir.1985)) (emphasis added)."

*United States v. Diaz,* 876 F.2d 1344, 1351 (7th Cir.1989). "This [evidentiary standard] includes, in conspiracy cases, circumstantial as well as direct evidence." *United States v. Williams,* 858 F.2d 1218, 1221 (7th Cir.1988).

"Circumstantial evidence may appropriately be utilized to demonstrate both a conspiracy and the defendant's participation in the conspiracy." *United States v. Vega,* 860 F.2d 779, 793 (7th Cir.1988). "Because conspiracies are carried out in secret, direct proof of agreement is rare." *United States v. Koenig,* 856 F.2d 843, 854 (7th Cir.1988) (citations omitted). As we observed in *United States v. Grier,* 866 F.2d 908, 923 (7th Cir.1989):

" 'Not only is the use of circumstantial evidence permissible, but "circumstantial evidence 'may be the sole support for a conviction.' " ' *United States v. Nesbitt,* 852 F.2d at 1510 (quoting *United States v. Williams,* 798 F.2d 1024, 1042 (7th Cir.1986) (dissenting opinion) which quoted, in turn, *United States v. McCrady,* 774 F.2d 868, 874 (8th Cir.1985)). " 'Circumstantial evidence is not less probative than direct evidence, and, in some cases is even more reliable." ' *Williams,* 798 F.2d at 1039 (dissenting opinion) (quoting *United States v. Andrino,* 501 F.2d 1373, 1378 (9th Cir.1974)). *See also Wisconsin Jury Instructions—Criminal, No. 170* ('[C]ircumstantial evidence may be stronger and more convincing that (sic) direct evidence'). '[T]he evidence " 'need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt.' " *United States v. Radtke,* 799 F.2d 298, 302 (7th Cir.1986) (quoting *United States v. Thornley,* 707 F.2d 622 (1st Cir.1983)).' *Koenig,* 856 F.2d at 854."

It is well settled that juries, in weighing the direct and circumstantial evidence presented, "are allowed to draw upon their own experience in life as well as their common sense in reaching their verdict," *Nesbitt,* 852 F.2d at 1511 (citing *United States v. Radtke,* 799 F.2d 298, 302 (7th Cir.1986)). Moreover,

"[W]e defer to the jury's determination of witnesses' credibility. As we noted in *United States v. Ramirez,* 796 F.2d 212, 214 (7th Cir.1986): 'An appellate court will not weigh the evidence or assess the credibility of the witnesses.' Similarly, we have stated: ' "It is well settled law that a court of appeals does not stand in judgment of the credibility of witnesses. Rather that question is left to the sound discretion of the trier of fact." ' *United States v. Perry,* 747 F.2d 1165, 1170 (7th Cir.1984) (quoting *United States v. Roman,* 728 F.2d 846, 856 (7th Cir.1984)). Finally, 'the credibility of witnesses is peculiarly within the province of the jury and our review of credibility is prohibited absent extraordinary circumstances.' *United States v. Noble,* 754 F.2d 1324, 1332 (7th Cir.1985)."

*Vega,* 860 F.2d at 794.

In order to convict Adamo of conspiracy to distribute cocaine, the government was required to establish that Adamo "knew of the conspiracy to [distribute drugs] and that he intended to join and associate himself with its criminal design and purpose." *Vega,* 860 F.2d at 792 (footnote omitted). As we observed in *United States v. Diaz:*

" ' 'Once a conspiracy is shown to exist, evidence that establishes a particular defendant's participation beyond a reasonable doubt, although the connection between defendant and conspiracy is slight, is sufficient to convict.... [M]ere association, knowledge or approval of a conspiracy is not sufficient to prove a defendant's guilt. However, while "mere presence at the scene of the crime or mere association with conspirators will not themselves support a conspiracy conviction ... presence of a single act will suffice if the circumstances permit the inference that the presence or act was

intended to advance the ends of the conspiracy." ' "

876 F.2d at 1352 (quoting *United States v. Xheka,* 704 F.2d 974, 988–89 (7th Cir.1983) which quoted, in turn, *United States v. Mancillas,* 580 F.2d 1301, 1308 (7th Cir.), *cert. denied,* 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978)). In addition,

> "While the parties to the agreement must know that others are participating in the conspiracy, they neither have to personally know the individuals involved [citation omitted] nor do they have to participate in every facet of the conspiracy scheme. [Citations omitted]. As long as the conspiracy continues and its goal is to achieve a common objective ... parties may still be found guilty even though they join or terminate their relationship with the co-conspirators at different times. [Citations omitted]."

*United States v. Noble,* 754 F.2d 1324, 1329 (7th Cir.), *cert. denied,* 474 U.S. 818, 106 S.Ct. 63, 88 L.Ed.2d 51 (1985).

Further, this court has held:

> " ' "[I]f each [defendant retailer] knew, *or had reason to know,* that other retailers were involved with the ... [drug kingpin's] organization in a broad project for the smuggling, distribution and retail sale of narcotics, and had reason to believe that their own benefits derived from the operation were probably dependent upon the success of the entire venture, the [trier of fact] *could find* that each had, in effect, agreed to participate in the overall scheme." *United States v. Baxter,* 492 F.2d 150, 158 (9th Cir.1973) (emphasis added).' *United States v. Cerro,* 775 F.2d 908, 911 (7th Cir.1985). In other words, '[if] the facts indicate that the defendant must have known something ... then a [trier of fact] may be able to find beyond a reasonable doubt that he did know it, especially since the requirement of knowledge is satisfied by proof that the defendant willfully shut his eyes for fear of what he might see if he opened them.' "

*United States v. Grier,* 866 F.2d 908, 924 (7th Cir.1989) (quoting *United States v. Cerro,* 775 F.2d 908, 911 (7th Cir.1985)).

■ Adamo maintains that the evidence presented during trial was insufficient to establish his membership in the cocaine distribution conspiracy because there is no evidence that he knew *when he sold the half kilo of cocaine to Paul Cozzolino* that Cozzolino intended to distribute rather than use it for personal consumption. We are convinced that Adamo's argument is seriously flawed, as it not only ignores the quantum of the evidence presented but also misconstrues the law of conspiracy.

The evidence adduced at trial established that Paul Cozzolino agreed to purchase a kilo of cocaine for delivery to "Ty" (Agent Simmons) in Illinois, and that Cozzolino borrowed $6,000 from William Pizzolongo and $6,000 from Ralph Cava to facilitate the purchase. Cozzolino testified that Adamo initially agreed to sell him a kilo of cocaine for $26,000 and later (due to Cozzolino's inability to raise $26,000) agreed to sell half a kilo for $12,000. Cozzolino, Pizzolongo and Cava all testified that during the afternoon of April 29, 1987, Cozzolino gave Adamo the $12,000 and Adamo entered a Bronx apartment building with the money; that Adamo exited the building with a sample of cocaine; that, later the same day, Adamo obtained a half kilo of cocaine and delivered it to Cozzolino; and that Cozzolino, Pizzolongo and Cava in turn delivered a portion of the half kilo to Agent Simmons in Peoria, Illinois, on May 4, 1987. Paul Cozzolino also stated that during the evening of April 29, 1987, after Adamo had purchased the cocaine in the Bronx, he told Adamo that " 'Ty' [Simmons] was ... the guy in Chicago" and "where [the] cocaine was going," at which point Adamo told Cozzolino to "call up the guy that you're bringing the cocaine to and give him my phone number." Furthermore, according to Cozzolino, Adamo advised him: "When you go to the airport, always keep it [the cocaine] on your body, don't keep it in the bag because you'll have a better chance getting into the airport if it is on your body."

As an initial matter, and contrary to Adamo's contention, there is evidence in the record—namely, the quantity of cocaine in-

volved—from which a rational jury could find that Adamo was well aware from the outset that Cozzolino was not a buyer for mere personal use, but purchased the cocaine for resale. As this court recently explained, "In a conspiracy to sell drugs, the supplier must *know* he is supplying a dealer," *United States v. Mancari*, 875 F.2d 103, 105 (7th Cir.1989) (emphasis in original), and juries may reasonably infer that a supplier providing a large quantity of narcotics to another person knows that the buyer is a dealer rather than a mere user. *Id. See also United States v. Douglas*, 874 F.2d 1145, 1151–57 (7th Cir.1989). This is not a case involving several sales of small quantities of cocaine (for example, quarters of an ounce, as in *Mancari*); rather, Adamo originally agreed to sell Cozzolino a kilo (approximately 2.2 pounds) of cocaine and eventually made a single bulk sale of half a kilo. The case law reflects that these quantities are sufficiently large that a jury could reasonably infer that they were purchased for purposes of distribution. *See United States v. Franklin*, 728 F.2d 994, 998–99 (8th Cir.1984) (collecting cases). Furthermore, ordinarily people don't spend $12,000 at a time on personal recreational drugs (at least not people of such apparently ordinary means as Cozzolino, a delicatessen owner). Thus, we have no doubt that a rational jury could find that Adamo, an obviously experienced drug dealer, knew from the beginning of his relationship with Cozzolino that the cocaine he supplied would be resold: "[if] the facts indicate that the defendant must have known something ... then a [trier of fact] may be able to find beyond a reasonable doubt that he did know it, especially since the requirement of knowledge is satisfied by proof that the defendant willfully shut his eyes for fear of what he might see if he opened them." *Grier*, 866 F.2d at 924.

■ Moreover, in the final analysis this case does not turn on what Adamo did or did not know at the moment he delivered the cocaine to Cozzolino, as it is well settled law that co-conspirators "neither have to personally know the individuals involved nor do they have to participate in every facet of the conspiracy scheme. As long as

the conspiracy continues and its goal is to achieve a common objective ... parties may still be found guilty even though they join or terminate their relationship with the co-conspirators at different times." *United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir.), *cert. denied*, 474 U.S. 818, 106 S.Ct. 63, 88 L.Ed.2d 51 (1985). In other words, the jury was not required to find that Adamo knew about the distribution conspiracy when he sold the drugs to Cozzolino, so long as it could find from the evidence that he "knew of the conspiracy [to distribute drugs] and ... intended to join and associate himself with its criminal design and purpose." *Vega*, 860 F.2d at 792.

The government in fact presented such evidence, as Paul Cozzolino testified that he told Adamo at the time he delivered the half kilo of cocaine that the cocaine would be distributed to "Ty ... the guy in Chicago." Furthermore, shortly thereafter Adamo requested that his telephone number be given to the Illinois buyer, from which the jury could reasonably infer his intent to associate himself with the distribution of the half kilo, as well as set himself up for future sales through direct contact with the buyer (thereby avoiding middle men like Cozzolino). In addition, the evidence demonstrates that Adamo, in an attempt to insure the conspiracy's continued enterprise, even advised Cozzolino to conceal the cocaine on his body rather than in a bag, "because you'll have a better chance getting into the airport if it is on your body"— advice reflecting the fact that canine sniff searches are usually conducted on luggage and packages rather than human beings. Considering "all the evidence and all the reasonable inferences that can be drawn from the evidence in the light most favorable to the government," *United States v. Nesbitt*, 852 F.2d 1502, 1509 (7th Cir.1988), we are convinced that a rational jury could find that Adamo knowingly joined and actively participated in the cocaine distribution conspiracy and associated himself with its criminal design and purpose. We reject his challenge to the sufficiency of the evidence.

## III.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Next, Adamo alleges he was denied his constitutional right to effective assistance of counsel because during trial his two attorneys of record failed to call June DiPalo (the sister of co-conspirator Lisa DiPalo) to testify as an alibi witness; failed to make a number of evidentiary objections; engaged in allegedly ineffective and harmful cross-examination; and failed to file objections to the presentence report.

To establish a claim of ineffective assistance of counsel, the defendant must satisfy the two-pronged test outlined in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under *Strickland*, initially the appellant must demonstrate that trial counsels' performance fell below an objective standard of reasonableness, recognizing that "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Second, the appellant must establish that "there is a reasonable probability that, but for counsels' unprofessional errors ... the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695–96, 104 S.Ct. 2068–69. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* at 694, 104 S.Ct. at 2068.

In his brief, Adamo states that "the single foremost example of counsel[s'] incompetency" was their failure to call co-conspirator Lisa DiPalo's sister, June, as an alibi witness. In support of his contention that June DiPalo was an "alibi witness," Adamo cites the following exchange between the prosecutor (Mr. Chambers) and Adamo's two trial attorneys (Mr. Shadid and Mr. Rose) on the day trial commenced:

"MR. CHAMBERS: The notice of alibi, I understand that the defendant is not intending to present [an] alibi.

MR. SHADID: That is correct also. We also have no written statements. The government filed a motion for written statements. We have no written statements in our production of any witness.

MR. ROSE: Can we have just a second? (Short Interruption.)

MR. SHADID: Your Honor, I was incorrect that I stated we do not have an alibi witness. June DiPalo would be considered an alibi witness.

MR. ROSE: To some extent she would establish that she was with the defendant during the period of time when his co-conspirators said he was somewhere else." [5]

**5.** The colloquy continued (although neither party's brief recites this portion of the transcript):

"THE COURT: Anything else?

MR. CHAMBERS: Well, your Honor, with that exposure [to an alibi defense] we would also ask for what is required by the alibi as far as the specific place or places the defendant claims to have been at the time of the alleged offense. Names and addresses of witnesses and all the other items under [Fed.R.Crim.P.] 12.1.

THE COURT: I would expect that could be done very quickly.... You are welcome to use our chambers and library, if you wish...."

The briefs also fail to recite an exchange which occurred prior to the colloquy set forth above, wherein defense counsel stated that the appellant Adamo telephoned June DiPalo, the alleged alibi witness, the day trial began. Counsel explained that DiPalo told Adamo that she had received a telephone call from somebody from the government and that (according to defense counsel) "she had been led to believe that she shouldn't come out here to testify for us because it might hurt Lisa, who is her sister, Lisa DiPalo." It appears from the transcript that the court, the prosecutor and defense counsel somehow determined that the government caller must have been a probation officer who contacted Ms. DiPalo several days before trial began regarding her sister Lisa's probation revocation hearing. Defense counsel then suggested that:

"we try to contact June DiPalo again and explain to her that the contact that was made was not meant to dissuade her from coming if she wanted to, but it was in connection with the bond revocation hearing and that they didn't need her to be present. And if that is adequate to convince her to come, then I don't think we need to burden you with that. But she is still uncertain about it. I suppose we could—

THE COURT: My suggestion is that counsel confer on that and come up with some way [of] dealing with that. Alternatively, I think you must consider the possible need to subpoena."

The record before us is silent with respect to the steps taken thereafter, if any, to secure June DiPalo's testimony and why defense counsel rejected the court's suggestion of subpoena power.

Defense counsel did not call June DiPalo to testify during trial and did not make an offer of proof as to what she would have testified to had she been called. Adamo argues that counsels' failure to call DiPalo as an alibi witness denied him effective assistance of counsel. However, the record before us and the statements made by defense counsel on the record fall far short of establishing that DiPalo was in fact an alibi witness. Prior to trial the government filed a "Motion for Notice of Alibi Defense" pursuant to Fed.R.Crim.P. 12.1(a), which triggered Adamo's duty under Rule 12.1(a) to file a "Written Notice of [His] Intention to Offer a Defense of Alibi" —if he intended to offer such a defense. Defense counsel chose not to file a "Notice of Alibi," a decision which could reasonably be interpreted to mean that counsel were not convinced that Ms. DiPalo could properly be characterized as an alibi witness. Indeed, on the day trial commenced, Mr. Shadid, one of Adamo's attorneys, stated that the prosecutor was "correct" in asserting that Adamo did not intend to present an alibi defense. It was only after Mr. Shadid conferred with his co-counsel, Mr. Rose, that Rose and Shadid made a qualified statement that "June DiPalo *would be considered* an alibi witness." (Emphasis added). Mr. Rose then added: *"To some extent* she would establish that she was with the defendant during the period of time when his co-conspirators said he was somewhere else." (Emphasis added).[6]

In our view, it is disingenuous, to say the least, to argue on appeal that Ms. DiPalo was an "alibi witness" when in fact defense counsel were unable to agree as to whether or not she should be characterized as such, and stated only that she "would be considered" an alibi witness because "to some extent" she would testify that Adamo was not where his co-conspirators said he was. It appears from counsels' comments that they somehow believed that Ms. DiPa-

lo could—to some extent—contradict testimony offered by Adamo's co-conspirators, which would perhaps undermine the co-conspirators' credibility, but from our examination of the record we fail to understand how her testimony would serve to absolve Adamo of guilt and warrant a conclusion that Ms. DiPalo is an alibi witness. Thus, based upon the evidence presented, we refuse to acquiesce in Adamo's characterization of June DiPalo as an "alibi witness." Nonetheless, the question remains whether counsel were ineffective in failing to call her as a witness.

This court has frequently considered whether and under what circumstances counsel's failure to call "alibi" and other witnesses to testify amounts to ineffective assistance of counsel. *See, e.g., United States v. Olson,* 846 F.2d 1103 (7th Cir. 1988); *Sullivan v. Fairman,* 819 F.2d 1382 (7th Cir.1987). These decisions recognize that once defense counsel conducts a reasonable investigation into all lines of possible defenses, counsel's strategic choice to pursue one line to the exclusion of others is rarely second-guessed on appeal. An appellate court will review an ineffective assistance of counsel ground only if counsel's conduct or decision was not made "in the exercise of reasonably professional judgment." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. *See also United States ex rel. Robinson v. Pate,* 312 F.2d 161, 162 (7th Cir.1963) (counsel not ineffective because strategic choice was one about which competent attorneys might honestly disagree). The appellate court will make " 'every effort ... to eliminate the distorting effects of hindsight' ... and must apply a 'heavy measure of deference to counsel's judgments.' " *Sullivan,* 819 F.2d at 1391 (quoting *Strickland* at 689, 691, 104 S.Ct. at 2065, 2066).

■ Adamo does not contend that defense counsel were ineffective in failing to investigate June DiPalo as an alibi witness;

---

6. Defense counsels' failure to designate Ms. DiPalo as an alibi witness prior to this time could conceivably have resulted in the trial court's excluding Ms. DiPalo's testimony for failure to comply with Rule 12.1(a) (*see* Rule 12.1(d)). However, the record reveals the trial judge did not exercise this option, as he instead directed defense counsel immediately to provide the government with the notice required under Rule 12.1(a). There is nothing in the record reflecting that defense counsel completed and in turn filed a Rule 12.1 Notice at that juncture.

he simply alleges that counsel should have called her to testify. The record reveals that counsel, in all likelihood, conducted a pretrial investigation and interview with Ms. DiPalo, as co-counsel disagreed on the record as to whether she was an alibi witness and ultimately informed the court and the prosecutor that Ms. DiPalo "would be considered an alibi witness" and "to some extent" would testify that she was with Adamo "when his co-conspirators said he was somewhere else." We note, in addition, that defense counsel were apparently aware of the nature and scope of Ms. DiPalo's testimony, as they had named her on the general list of defense witnesses submitted prior to trial. It merits mention that counsel also named Adamo and one other person on their list of witnesses, but chose not to call either of them or any other defense witness to the stand. *Strickland* commands that we indulge a strong presumption that counsels' decision not to present June DiPalo's testimony (or that of any other defense witness) was a proper exercise of trial strategy, as "the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. As we stated in *Olson,* an attorney's post-investigation decision not to pursue an alibi defense "is precisely the kind of strategic choice, made by a competent, experienced and well-trained lawyer that a court should not second-guess, and this court will not." 846 F.2d at 1109. *See also Sullivan,* 819 F.2d at 1391 ("strategic choices made after thorough investigation ... are virtually unchallengeable.") (quoting *Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066–67). Because we hold that defense counsels' decision not to present June DiPalo's testimony did not fall below the objective standard of reasonableness as outlined in the two-pronged *Strickland* test, we need not consider whether her absence was prejudicial to Adamo's defense.

Adamo also urges that counsel was ineffective in failing to object to co-conspirators Cozzolino, Pizzolongo and Cava's testimony that a "Colombian" entered and exited the Bronx apartment building at approximately the same time as Adamo on April 29, 1987, on the ground that there was no evidence the person was a Colombian and that the characterization tended to associate Adamo with drug trafficking; to the same witnesses' conclusion that the "Colombian" sold drugs to Adamo in the Bronx apartment building; and to hearsay testimony regarding Adamo's participation in the conspiracy. He also complains that during cross-examination defense counsel referred to the individual in the Bronx apartment building as a "Colombian" and asked a question which prompted a witness to repeat damaging testimony previously elicited on direct examination.

As the Supreme Court observed in *Strickland,* it is not our purpose in evaluating an ineffective assistance claim to grade counsels' performance. 466 U.S. at 697, 104 S.Ct. at 2069. Thus, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.*

"[A] court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors."

*Strickland*, 466 U.S. at 695–96, 104 S.Ct. at 2068–69.

■ In part II above, we set forth substantial circumstantial as well as direct evidence—the admissibility and relevance of which is unchallenged on appeal—of Adamo's participation in the conspiracy for which he was indicted. We are convinced that the various references to the "Colombian," counsels' failure to object to hearsay testimony and the testimony counsel elicited during cross-examination did not detract from the overwhelming evidence of guilt. For example, the suggestion that the jury's verdict was affected by references to the "Colombian" is ludicrous, as not all Colombians are drug dealers and, regardless of the nationality of the person Adamo met in the Bronx apartment building, the evidence established that Adamo purchased drugs and subsequently sold them to Cozzolino for distribution in Illinois. Thus, in our view, even if defense counsels' trial performance was deficient—a view we do not share—counsels' deficiency was harmless in light of the substantial record evidence of guilt. Reading the record in its entirety, we have no hesitation in concluding that the jury would and should have found Adamo guilty of the crimes charged beyond a reasonable doubt, notwithstanding counsels' alleged errors.

■ In addition, Adamo submits that trial counsel were incompetent in adopting the pretrial motions of his co-conspirators, but he has failed to delineate how his interests were compromised by counsels' decision to do so. Indeed, the adoption of co-defendants' motions is entirely proper and efficient, as attorneys do not waste time duplicating motions already on file and are free to pursue other lines of defense. Moreover, Adamo's defense counsel filed motions in addition to adopting co-defendants' motions, including a Motion to Determine Admissibility of Statements Made by Alleged Co–Conspirators, a Motion for Judgment of Acquittal and New Trial, and a Motion for Bond Reduction. In a similarly careless fashion, Adamo also complains that trial counsel failed to file any objections to the presentence report,

but has failed to identify, much less articulate, any specific inaccuracies or factual disputes in the report, and we have no reason to believe that trial counsel could have filed any meritorious objections to it. We therefore reject both of these bald, unsupported allegations of ineffective assistance of counsel.

■ Lastly, Adamo argues that trial counsel were ineffective in failing to object to the following: testimony regarding Adamo's personal use of cocaine; evidence of drug paraphernalia found in his apartment, including a "triple beam" scale, several smoking pipes and four butane "torches" used for heating (or "free-basing") cocaine; and certain allegedly improper comments the prosecutor made during his closing argument. As we explain in Part VII, *infra*, the prosecutor's remark during closing argument that Adamo used lactose to dilute ("cut") cocaine in his apartment was a proper, reasonable inference drawn from the evidence presented during trial, and his mistaken comment that Adamo sent cocaine in "stuffed animals" was quickly corrected and was not prejudicial; also, evidence of Adamo's drug paraphernalia was relevant to the government's theory that he was a cocaine dealer and the source of the cocaine sold to Agent Simmons; in addition, evidence of his personal use of cocaine was important and relevant to the jury's understanding of the critical events of April 29, 1987, when Adamo and his co-conspirators sampled the cocaine they subsequently distributed in Illinois. Because the prosecutor's statements and evidence to which Adamo objects on appeal were relevant, and therefore proper, counsels' failure to make objections in the trial court was not objectively unreasonable, and we are convinced that the absence of objection did not prejudice the defense.

We believe it is appropriate at this juncture to reiterate our observations in *United States v. Olson:*

> "Many of these claims of ineffective assistance of counsel which come to our attention, like the claims raised here, are without merit and accomplish little other than the waste of judicial resources, and

possibly reflect unfairly on trial counsel. While the Supreme Court has noted that it is a 'natural tendency to fault an unsuccessful defense,' it has stated forcefully that the tendency is one that courts must 'counteract.' *Nix v. Whiteside*, 475 U.S. 157, 165, 106 S.Ct. 988, 994, 89 L.Ed.2d 123 (1986). Otherwise,

> '[c]riminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one on counsel's unsuccessful defense. Counsel's performance and even willingness to serve could be adversely affected. Intensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client.'

*Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066. Thus the Court, in *Strickland*, set a stringent standard to be applied to claims of ineffective assistance of trial counsel and it should be adhered to."

846 F.2d at 1111.

## IV.

### CO–CONSPIRATOR STATEMENTS

Adamo also argues that co-conspirator statements, which he also fails to identify, should not have been admitted during trial under the co-conspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E).[7] In his brief, he posits a general objection to the admission of "statements made by the co-conspirators prior to that night in late April of 1987 when Adamo first learned that the cocaine was being shipped to Peoria...."

We were recently confronted with a similar ambiguous allegation in *United States v. Williams*, 877 F.2d 516 (7th Cir.1989). In *Williams*, the defendant challenged his conviction on the ground that the trial court should have admitted "certain conversations"—which he failed specifically to identify—between the defendant and another person. We stated:

> "'It is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel.' [*Sanchez v. Miller*, 792 F.2d 694, 703 (7th Cir.1986), *cert. denied*, 479 U.S. 1056 [107 S.Ct. 933, 93 L.Ed.2d 984] (1987) ].... Williams has failed even to identify the facts necessary to support the issue he raises. Although the United States Attorney has made a fine attempt to identify the 'certain conversations' that Williams claims should have been admitted, this is not the government's responsibility. Neither this court nor the United States Attorney has a duty to comb the record in order to discover possible errors. Williams, therefore, has waived this issue."

*Williams*, 877 F.2d at 518–19 (citations omitted).

As in *Williams*, we refuse to comb and search the record in search of "the statements" of Adamo's co-conspirators, if any, which may arguably be inadmissible under Rule 801(d)(2)(E). We will, however, address Adamo's theory that these unspecified co-conspirator statements are inadmissible against him because the statements were made before he was told that the cocaine he supplied would be distributed to "Ty" in Peoria, Illinois. As we stated in Part II above, the record reveals substantial evidence that a conspiracy to distribute cocaine existed on or before April 29, 1987, and more than sufficient evidence that Adamo knowingly joined the conspiracy. Even if Adamo was not a member of the conspiracy until the evening of April 29, when he was told that the cocaine would be distributed in Peoria, it is well established that a defendant who joins a conspiracy "[takes] the conspiracy as he found it. When he joined and actively participated in

---

7. This rule provides:

   "**(d) Statements which are not hearsay.** A statement is not hearsay if— ...

   **(2) Admission by party-opponent.** The statement is offered against a party and is ...

   (E) a statement by a co-conspirator of a party during the course and in furtherance of a conspiracy."

it he adopted the previous acts *and declarations* of his fellow co-conspirators." *United States v. Coe,* 718 F.2d 830, 839 (7th Cir.1983) (quoting *United States v. Hickey,* 360 F.2d 127, 140 (7th Cir.1966) (emphasis in original)). *See also United States v. D'Antoni,* 874 F.2d 1214, 1218 (7th Cir.1989); *United States v. Tuchow,* 768 F.2d 855, 868 (7th Cir.1985). Thus, "the declarations and acts of the various members [of the conspiracy], even though made or done prior to the adherence of some to the conspiracy become admissible against all as declarations or acts of co-conspirators in aid of the conspiracy." *Coe,* 718 F.2d at 839.

## V.

### MISSING WITNESS INSTRUCTION

■ In spite of the fact that Adamo's trial counsel failed to request a "missing witness" instruction (and there is no contention that they were "ineffective" in failing to do so), appellate counsel submits that the trial judge committed error in failing to give such an instruction. Specifically, counsel on appeal posits that the trial judge should have instructed the jurors that they could infer from the government's failure to call co-conspirator Lisa DiPalo (not to be confused with her sister June, the alleged "alibi witness" discussed in Part III) to testify during trial that her testimony would have been unfavorable to the government. It is well settled that complaints regarding jury instructions not raised in the trial court are waived on appeal.[8] Nonetheless, Adamo's appellate counsel urges that the court's failure to give a missing witness instruction was plain error under Fed.R.Crim.P. 52(b).

"A plain error is not just one that is conspicuous but one whose correction is necessary to prevent a 'miscarriage of justice,' [citation omitted] and therefore 'it is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court,' [citation omitted].... [T]here is no miscarriage of justice if the defendant's guilt is so clear that he would certainly have been convicted even if the error had never been committed; hence, 'plain error must be of such a great magnitude that it probably changed the outcome of the trial' [citations omitted]."

*United States v. Kerley,* 838 F.2d 932, 937 (7th Cir.1988).

At the outset, we are convinced the evidence of Adamo's guilt is so overwhelming that he would certainly have been convicted even had the missing witness instruction been given. Furthermore, we are not convinced that a missing witness instruction was appropriate in this case. A party is entitled to a missing witness instruction only upon demonstration that: (1) the witness is peculiarly within the other party's power to produce; and (2) the missing witness would elucidate issues in the case. *United States v. Rollins,* 862 F.2d 1282, 1297–98 (7th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 2084, 104 L.Ed.2d 648 (1989) (citing *United States v. Mahone,* 537 F.2d 922, 926–27 (7th Cir.), *cert. denied,* 429 U.S. 1025, 97 S.Ct. 646, 50 L.Ed.2d 627 (1976)). A missing witness' testimony would not elucidate issues in the case where the unpresented evidence would be merely cumulative, or irrelevant. *Id.*

Even if Lisa DiPalo was peculiarly within the government's power to produce (a matter we need not and do not reach),[9] based on the record presented for review we can only speculate as to whether Ms. DiPalo's unpresented testimony would have elucidated any issue in the case, or would instead have been merely cumulative or irrelevant or damaging to the credibility of certain witnesses. Adamo made no attempt to establish through an offer of proof what DiPalo would in fact have testi-

---

8. Fed.R.Crim.P. 30 ("No party may assign as error any portion of the [jury] charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection.").

9. We note, however, that DiPalo was physically available to both parties, as she was present in the courtroom during the course of the trial.

fied to had she been called to the stand. In a similar situation, we held in *United States v. Mahone*, 537 F.2d 922, that the trial court did not commit error in refusing to give a missing witness instruction where we could not determine from the record whether the unpresented testimony would have been meaningful, rather than cumulative or irrelevant. *Id.* at 927. We also stated:

> " '[I]n the in-between case where each side has the physical capacity to locate and produce the witness, and it is debatable which side might more naturally have been expected to call the witness, there may be latitude for the judge to leave the matter to debate without an instruction, simply permitting each counsel to argue to the jury concerning the "natural" inference of fact to be drawn.' "

*Id.* at 927–28 (quoting *United States v. Young*, 463 F.2d 934, 943 (1972)).

Here, the trial court advised Adamo's counsel that he could refer during closing argument to the inferences that might be drawn from Lisa DiPalo's failure to testify, and counsel did so. The court also allowed the government to respond to defense counsels' missing witness argument, and it did respond. Thus, the jury was not left in the dark regarding DiPalo's absence at trial, and was certainly capable of drawing reasonable inferences from her nonappearance in the absence of a jury instruction. Therefore, we hold that the trial court's failure to give the missing witness instruction does not rise to the level of plain error.

## VI.

### EXCESSIVE SENTENCE

The appellant further alleges that his sentence of fifteen years in prison is excessive in light of his favorable employment record and references, the nature of his crime and the disparity between his sentence and those imposed on his co-conspirators.[10] As we stated in *United States v. Vega*, 860 F.2d 779 (7th Cir.1988):

> "It is well settled that 'a trial judge in the federal system generally has wide discretion in determining what sentence to impose.' *United States v. Tucker*, 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972). In making this discretionary determination 'a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come.' *Id.* It follows that ' "[a] sentence which is within the limits established by statute under which it is imposed will not be vacated upon review unless the sentencing judge relied upon improper considerations or unreliable information in exercising his discretion or failed to exercise any discretion at all in imposing the sentence." ' *United States v. Ford*, 840 F.2d 460, 466 (7th Cir.1988) (quoting *United States v. Harris*, 761 F.2d 394, 402–03 (7th Cir.1985))."

*Vega*, 860 F.2d at 800.

Adamo concedes that his sentence falls within the statutory limits set forth in 21 U.S.C. §§ 841 and 846, and he does not argue that the trial judge relied upon unreliable information or improper considerations.[11] Thus, the only question before us is whether the trial judge "failed to exercise any discretion at all in imposing the sentence." *Id.*

The trial judge noted at the sentencing hearing that cocaine trafficking is a very serious offense; that Adamo was an inte-

---

**10.** We note that the sentencing guidelines issued pursuant to the Sentencing Reform Act of 1984 do not apply in this case, as the offense in issue occurred prior to November 1, 1987, the effective date of the Act. *See United States v. Stewart*, 865 F.2d 115 (7th Cir.1988).

**11.** In his reply brief, Adamo asserts that the judge improperly considered the prosecutor's comment during the sentencing hearing that the court should impose a substantial period of incarceration to "reward" the arresting officers.

As a general rule, this court will not consider issues raised for the first time in a reply brief, *see, e.g., United States v. Lowe*, 860 F.2d 1370, 1375 (7th Cir.1988). In any case, the record of the sentencing hearing reflects that the judge never mentioned "rewarding" the arresting officers. Therefore, because there is no evidence in the record that he took the prosecutor's comment into consideration, we refuse to speculate as to his thoughts.

gral part of the conspiracy to distribute cocaine in that he was instrumental not only in locating but also in facilitating the transfer of a large quantity of cocaine from New York to Peoria, Illinois; that Adamo escalated the level of drug trafficking of co-conspirator Paul Cozzolino; that the cocaine Adamo obtained was tested as having a very high level of purity; that Adamo had five prior criminal convictions, three of which were drug related, and that all of the previous charges against Adamo had been reduced; that the previous decisions to reduce the charges against Adamo "obviously sent the wrong message to you concerning the consequences of criminal conduct"; and that Adamo was on probation and achieving only "marginal" participation in a drug treatment program when he participated in the present conspiracy. The court also observed that Adamo's employment record was "not bad," that he had been drug free since he was released on bond in this case and that his character references were supportive. Nonetheless, the court stated that these factors, considered with other evidence in the record, did not dissuade it from imposing a substantial period of incarceration.

■ We are convinced, based on the trial judge's recorded comments, that the trial judge did in fact exercise his discretion during the sentencing hearing, considered all of the facts presented, and assigned them just such weight as he deemed appropriate. In the absence of evidence that the court relied upon improper considerations, we refuse to second-guess the court's decision. *See United States v. Monzon*, 869 F.2d 338, 347 (7th Cir.1989). In light of the entire record presented, including but not limited to the seriousness of the offense for which Adamo was convicted in this proceeding as well as his history of drug-relat-

ed crimes, we hold that the court did not abuse its discretion in imposing a fifteen-year prison term.[12]

## VII.

## OTHER CLAIMS

We turn at last to several additional allegations of error, none of which were raised in the trial court. There is perhaps no rule of appellate practice more fundamental or well established than the rule that claims of error not raised in the district court are waived on appeal, *see, e.g., United States v. Hollins*, 811 F.2d 384, 386 (7th Cir.1987), and this court will not tolerate transparent, meritless attempts to circumvent the waiver rule with the contention that the alleged defects in the district court's disposition were "plain errors" under Fed.R.Crim.P. 52(b). Adamo urges that we address the following allegations of "plain error" because trial counsels' failure to raise objections in the trial court is part of Adamo's ineffective assistance of counsel claim.

■ Initially, Adamo submits that the trial court committed plain error in allowing the prosecutor to remark during his closing argument that Adamo used the lactose found during a search warrant investigation of his apartment as an additive to "cut" cocaine, on the ground that there was no direct evidence that Adamo used the lactose for that purpose. FBI Agent DiFillipo testified that he seized lactose from Adamo's apartment when he executed a search warrant for the premises, and that based upon his extensive experience as an FBI agent investigating drug (cocaine) dealers, lactose was used to "cut" cocaine. The prosecutor may in argument suggest reasonable inferences from evidence previously admitted, *United States v. Carter*, 720 F.2d 941, 950 (7th Cir.1983), and it was

---

12. The record does not permit consideration of Adamo's contention that his sentence is excessive as compared with the sentences imposed upon his co-conspirators. We stated in *United States v. Neyens*, 831 F.2d 156, 159 (7th Cir. 1987): "[I]t is settled law that a defendant who argues [sentence] disparity alone has not made out a claim of an improper exercise of the district court's discretion.... Only when a judge imposes disparate sentences on similar defendants without explanation does even an inference of impropriety arise." It appears from the transcript of Adamo's sentencing hearing that Adamo and his co-conspirators were sentenced at different times, and the record does not reflect the sentences imposed upon the co-conspirators. Therefore, we are unable to determine if a sentence disparity exists, and, if so, whether the trial court explained why it imposed disparate sentences.

certainly reasonable, given other physical and testimonial evidence linking Adamo to cocaine trafficking, that the prosecutor suggest that Adamo used the lactose found in his apartment to "cut" cocaine.

In a further attack on the prosecutor's closing, Adamo asserts that the prosecutor improperly stated that Adamo's "part of this operation was being sent ... in stuffed animals ...," while the record reflects that the cocaine Adamo supplied was delivered to Agent Simmons concealed in a plastic bag surrounded with coffee grounds. The full text of the prosecutor's "stuffed animals" remark reflects that he immediately recognized his error, and corrected it, stating: "Joseph Adamo ... A man whose part of this operation ... was being sent in stuffed animals through the mail, *in coffee cans* to disguise its odor so it would not be detected by sniffing dogs or other police apparatus." (Emphasis added). Even if the prosecutor had failed to correct his mistake, it strains credulity to suggest that the jury would be prejudiced merely by a misstatement by the prosecutor as to the type of container used to conceal the cocaine.

The appellant also complains that the government's testimony regarding his personal use of cocaine was prejudicial and irrelevant to the charge of conspiracy to distribute cocaine. Several witnesses testified that Adamo purchased a "sample" of cocaine for Cozzolino, Pizzolongo and Cava in the Bronx on April 29, 1987, and proceeded to Adamo's apartment where Adamo, Cozzolino and Lisa DiPalo ingested cocaine. The government offered evidence of Adamo's use of cocaine as part of the witness' chronology of the co-conspirators' activities during the critical hours of April 29 when Adamo became aware of and actively participated in the conspiracy. We believe that the absence of the evidence would have left a "chronological and conceptual void" in the witness' testimony, *see United States v. Bucey,* 876 F.2d 1297, 1314–15 (7th Cir.1989), and that the evidence was therefore relevant and properly admitted. Moreover, even if there was error in admitting the evidence (a premise with which we

do not agree), the error was harmless in light of the substantial, untainted record evidence of guilt. *See United States v. Molinaro,* 877 F.2d 1341, 1345–1346 (7th Cir.1989).

Adamo further asserts that the trial court should have excluded evidence of a "triple beam" scale, various smoking pipes and butane "torches" used for "free-basing" cocaine, all of which were found during a search of his apartment, on the grounds that the evidence was irrelevant and prejudicial. District courts have broad discretion on evidentiary matters, including determinations regarding the relevancy of proffered evidence. *United States v. Alvarez,* 860 F.2d 801, 829 (7th Cir.1988). As we recently stated in *United States v. Blandina,* No. 87–3120, slip op. at 11 (7th Cir. July 12, 1989), a defendant "carries a heavy burden in challenging a trial court's evidentiary rulings." " '[A] reviewing court gives special deference to the evidentiary rulings of the trial court. We shall only overrule such rulings on a showing that the trial court has abused its discretion.' " *Id.* (quoting *United States v. Kaden,* 819 F.2d 813, 818 (7th Cir.1987)). As we have noted, Adamo's counsel on appeal concedes that trial counsel failed to object to the admission of the scale, pipes and butane torches, and thus seeks review under the plain error standard. Fed.R.Crim.P. 52(b).

Agent DiFilippo testified, and it is commonly recognized, that a scale is a "tool of the trade" for dealers of narcotics. *Molinaro,* at 1346. There can be no doubt that evidence of the scale found in Adamo's apartment was relevant in proving that he was a cocaine dealer and a vital member of the conspiracy to distribute cocaine in Peoria, Illinois. *See id.* Evidence of the smoking pipes and butane torches has less obvious relevance to the charge of conspiracy to distribute, as these items are generally used for personal consumption rather than distribution of cocaine. *Molinaro,* at 1346. Nonetheless, we have no doubt that the admission of these items was entirely proper to corroborate several witnesses' testimony that Adamo, Cozzolino and Lisa Di-

Palo went to Adamo's apartment and smoked and ingested "samples" of the cocaine eventually delivered to Agent Simmons. Moreover, the trial court mitigated any prejudice resulting from its presentation in admonishing the jury to consider evidence of the items seized from the appellant's apartment only "in connection with the issues or disputes relating to the charge of conspiracy and not for any other purpose," and that "[t]he defendant is not charged with the offense of possession of cocaine...."

In addition, Adamo submits that the trial court committed plain error in admitting evidence of cocaine found in Paul Cozzolino's delicatessen, but the appellant has failed to identify any prejudice he could have suffered from the admission of the evidence, and we are unable to perceive any.

 Lastly, it is urged that it was improper for Agent Simmons to sit at the prosecutor's table during trial because, according to Adamo's brief, the seating arrangement somehow resulted in the prosecutor's improper "tacit endorsement" of Agent Simmons. We note that Agent Simmons was exempt from sequestration, *see* Fed.R.Evid. 615(2) and (3), and that the appellant has failed to cite a single case holding that it is improper or inherently prejudicial for an investigative agent to be seated with the prosecutor during trial. Rather, the legislative history of Rule 615, and decisions in other circuits, make it clear that a governmental investigative agent, even though he is also a witness, may be designated to sit at the government counsel's table. *See* S.Rep. No. 1277, 93rd Cong., 2d Sess. 26 (1974), reprinted in *1974 U.S.Code Cong. & Adm.News*, 7051, 7072–73. *See also United States v. Perry*, 643 F.2d 38, 53 (2d Cir.1981); *United States v. Little*, 753 F.2d 1420, 1441 (9th Cir.1984); *United States v. Shearer*, 606 F.2d 819 (8th Cir.1979).

## VIII.

We hold that there is more than sufficient evidence in the record to support the jury's verdict, that trial counsel provided effective assistance and that the trial judge neither abused his discretion nor committed plain error in conducting the trial and imposing sentence.

We might add that Adamo raises a number of grounds for reversal in this case, none of which are persuasive. This is the sort of "buckshot approach," where counsel has only a mere "hop[e] [that] a pellet will strike," that this court has disapproved in the past, *Ruiz v. Cady*, 710 F.2d 1214, 1218 (7th Cir.1983), and again disapproves today.

The judgment of the district court is hereby

AFFIRMED.